Rosann C. **SCHEETZ**; Kenneth L. Scheetz, Jr., Appellants,

v.

**THE MORNING CALL, INC.**; Terry L. Mutchler; John Doe and/or Jane Doe.

No. 90–1783.

United States Court of Appeals, Third Circuit.

Argued May 7, 1991.

Decided Oct. 3, 1991.

Rehearing and Rehearing In Banc Denied Oct. 31, 1991.

James T. Huber (argued), Huber & Waldron, Allentown, Pa., for appellants.

Malcolm J. Gross (argued), Gross, McGinley, LaBarre & Eaton, Allentown, Pa., for appellees.

Before MANSMANN and NYGAARD, Circuit Judges, and RONEY, Senior Circuit Judge.[*]

## OPINION OF THE COURT

NYGAARD, Circuit Judge.

In this section 1983 action, plaintiff-appellants Kenneth and Rosann Scheetz allege that the defendants, a local newspaper, a reporter, and an unnamed state actor, conspired to deprive the Scheetzes of their constitutional right of privacy. The district court granted summary judgment in favor of the defendants. We will affirm.

### I.

Kenneth Scheetz is a police officer in the City of Allentown. Rosann Scheetz is his wife. In the course of an argument between them in their home in January of 1988, Kenneth struck Rosann. Rosann left the house, but returned approximately a half an hour later. The argument resumed, and Kenneth again struck Rosann.

Rosann called the Allentown police. Two officers responded and prepared a standard "offense/incident" report, consisting of a face sheet and supplemental reports. The "face sheet" of this report[1] stated that Rosann Scheetz had reported a domestic disturbance, that two police cars had responded, and that Rosann had left the home.

In the meantime, Rosann had driven to the Allentown police station, apparently with the intention of filing a Pennsylvania Protection From Abuse Petition. The offi-

---

[*] Honorable Paul H. Roney, United States Senior Circuit Judge for the Eleventh Circuit Court of Appeals, sitting by designation.

1. The "face sheet" is a public document similar to a police blotter. The parties agree that this document is a public record. The parties dispute whether the "supplemental reports" are public records available under Pennsylvania's Right to Know Law. There is some evidence that these reports were generally available, subject to the approval of a police supervisor.

cers who interviewed Rosann prepared two "supplemental reports" and made them part of the file. They reveal that Rosann stated that her husband had beaten her before and had refused counseling. The police gave Rosann three options: file criminal charges, request a protection from abuse order, or initiate department disciplinary action against Kenneth. These supplements also note that Rosann had visible physical injuries, that Rosann did not want to return home and that she was permitted to spend the night in the shift commander's office.

Chief Wayne Stephens filed a third supplement to the report. He had spoken to Kenneth about the incident, and the third supplement memorialized this fact, as well as Kenneth's statement to the Chief that he and his wife were scheduled to speak with a marriage counselor. None of the supplements indicated that the Chief took any disciplinary action against Kenneth.

Shortly after the incident, Kenneth Scheetz was named "Officer of the Year" by Chief Stephens. Several months later, as part of "Respect for Law Week," press releases and photos of Kenneth were released. A dinner and official ceremony were held in Kenneth's honor. The Morning Call ("The Call"), a local newspaper, published a story and photo on this honor.

Terry Mutchler, a reporter for The Call, became interested in investigating the prior incident involving Kenneth and Rosann. Another reporter from the paper had tried to get the police report from the police, who refused to release it. Mutchler's request for a copy of the report from the department was also formally refused. Mutchler nonetheless managed to get a copy of the report.[2]

Mutchler then interviewed Chief Stephens about the incident. Chief Stephens initially denied the incident, but when confronted with Mutchler's information, he claimed that the report was stolen and refused further comment. Chief Stephens did, however, offer his insights into the subject of spousal abuse, stating "people fake it" and "women ... tear their dresses and rip up their bras and say they were raped." Mutchler also interviewed Deputy Chief Monaghan, who offered assorted rationalizations for why no follow up had been done on the Scheetz incident. The Scheetzes refused comment on the incident.

The Call published an article by Mutchler titled "Police didn't investigate assault complaint against officer." Eight paragraphs of the article were comprised of quotes from the police report of the beating incident which detailed the injuries Rosann received. The bulk of the article, however, focused on the lack of investigation and follow-up by the police department. Chief Stephens was quoted as saying that the incident had not been investigated. The article also quoted the comments Chief Stephens had made to Mutchler about domestic abuse, as well as Deputy Chief Monaghan's explanations for why no charges were pressed. The last two columns of the article consisted of quotes from Kenneth's superiors praising his work.

Apparently Chief Stephens's comments provoked a number of calls to the department questioning his commitment to the protection of women. At Chief Stephens's request, The Call sent a different reporter to interview Stephens the next day. The Call then published an article entitled "Chief says beating report investigated like others." In this article, Stephens attempted to clarify his earlier statements. He stated that the incident with Scheetz had

---

**2.** There is some dispute as to how Mutchler obtained a copy of the report. Mutchler submitted an affidavit in which she stated that she spoke to various confidential sources to see if any of them had a copy of the report. Mutchler averred that she did not conspire with or encourage anyone to steal the report. A source then showed her a copy of the report, and she copied information from it. Mutchler copied information from both the "face sheet" and the "supplemental reports." The plaintiffs cannot counter this affidavit, primarily because Mutchler's source remains confidential. Chief Stephens stated at his deposition that he told Mutchler that the report was stolen, but he also stated that he did not suspect that Mutchler had stolen it. Because we decide this appeal on other grounds, we need not resolve this dispute over how the report was obtained.

been investigated. He explained he had initially thought he was being asked if he had *personally* investigated the complaint, and that was why he said no investigation was done. He also attempted to clarify his statements about domestic abuse. Three paragraphs towards the end of the article briefly recap the events listed in the police reports.

Kenneth and Rosann then sued Mutchler, The Call, and "John or Jane Doe." The complaint alleged that Mutchler and The Call had conspired with an unknown state actor (the Doe defendant) to deprive the Scheetzes of their constitutional right to privacy in violation of 42 U.S.C. § 1983. The complaint also raised several pendent state law claims.

The Call and Mutchler filed an answer that denied liability and raised jurisdictional and other defenses. After limited discovery, The Call and Mutchler filed a motion to dismiss the Doe defendant and to dismiss the action for lack of subject matter jurisdiction. The district court considered the motion to dismiss and to dismiss the Doe defendant and decided to deny it, but indicated that it would reconsider the issues after reasonable discovery had been completed. 130 F.R.D. 34. After the defendants refused to answer questions about Mutchler's source, the Scheetzes filed a motion to compel. Defendants then renewed their prior motions, and filed additional motions for judgment on the pleadings, summary judgment and a protective order.

The district court granted the defendants' motion for summary judgment in part, denied it in part, granted judgment to the defendants on the § 1983 claim, dismissed the pendent state claims, dismissed the Doe defendant and dismissed all remaining motions as moot. 747 F.Supp. 1515. The Scheetzes appeal.

The district court had jurisdiction over the subject matter of this section 1983 action pursuant to 28 U.S.C. §§ 1331 & 1343. We have jurisdiction over this appeal from a final order by the district court pursuant to 28 U.S.C. § 1291.

■  Our review of a grant of summary judgment is plenary. Summary judgment is appropriate if there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In reviewing a grant of summary judgment, we accept all of the non-moving party's allegations as true and draw all factual inferences in the non-moving party's favor. *Erie Telecommunications, Inc. v. City of Erie*, 853 F.2d 1084, 1093 (3d Cir.1988).

## II.

The district court concluded that the Scheetzes had alleged a *prima facie* section 1983 violation, but that the first amendment rights of the defendants outweighed the Scheetzes' privacy interests. The defendants invite this court to affirm on the alternative ground[3] that this claim is not actionable under section 1983. Because we conclude that the Scheetzes have not alleged a violation of a constitutionally protected privacy interest, we will affirm.

The defendants rely on dicta in *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) to support their argument that "garden variety" invasion of privacy claims are not actionable under section 1983. *Paul* involved a plaintiff who had been arrested for shoplifting and acquitted. His name and photo, however, appeared on a flyer of "known shoplifters" circulated to merchants by a group of police chiefs. The plaintiff sued under section 1983, alleging that he had a due process liberty interest in his reputation and that the police chiefs had violated his constitutional rights by defaming him.

---

**3.** Defendants also invite this court to affirm on the alternative ground that plaintiffs failed to establish a conspiracy between The Call, Mutchler, and a state actor. Such a conspiracy is necessary to establish § 1983 liability on behalf of the private actors. *See Adickes v. S.H. Kress*

*& Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Labov v. Lalley*, 809 F.2d 220 (3d Cir.1987). Because we will affirm on the ground that plaintiffs have failed to allege a violation of a constitutional privacy right, we need not reach this issue.

The Supreme Court rejected the proposition that reputation alone was a liberty or property interest within the meaning of the due process clause. In dicta, the Court went on to consider the alternative argument that the police chiefs' action constituted a violation of the plaintiff's right to privacy. After first noting that privacy decisions had been limited in the past to family and procreative matters, the Court concluded that publication by the state of an official act such as an arrest could not constitute invasion of the constitutional right to privacy. *Paul*, 424 U.S. at 713, 96 S.Ct. at 1166.

The very next year, however, the Court held in *Whalen v. Roe*, that the right to privacy extends to both "the individual interest in avoiding disclosure of personal matters, and ... the interest in independence in making certain kinds of important decisions." 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977). *Whalen* recognized that the information contained in medical records is constitutionally protected under the confidentiality branch of the privacy right.

Thus, some confidential information is protected under the confidentiality branch of the right to privacy, the dicta in *Paul* notwithstanding.[4] *See, e.g., Nixon v. Administrator of General Services*, 433 U.S. 425, 457-58, 97 S.Ct. 2777, 2797-98, 53 L.Ed.2d 867 (1977) (president has constitutionally protected privacy right in personal papers). Accordingly, the Scheetzes in this case contend that the information contained in the police incident report is similarly protected by the federal right.

Although cases exploring the autonomy branch of the right of privacy are

legion, the contours of the confidentiality branch are murky. We have recognized that some confidential information, such as medical records, is constitutionally protected under the confidentiality branch of the federal privacy right. *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570 (3d Cir.1980); *c.f. Fraternal Order of Police, Lodge No. 5 v. Philadelphia*, 812 F.2d 105 (3d Cir.1987) (§ 1983 action by officers challenging various employment tests and questionnaires as violative of privacy rights). Other courts have similarly recognized that § 1983 may be used to redress violations of a constitutional confidentiality right. *Borucki v. Ryan*, 827 F.2d 836 (1st Cir.1987) (allowing § 1983 action based on disclosure of psychological records, but concluding that qualified immunity shields officers because right was not clearly established at time of violation); *Fadjo v. Coon*, 633 F.2d 1172, 1175 (5th Cir. Unit B 1981) (plaintiff stated a claim under § 1983 where state officials disclosed intimate, personal information to insurance companies).

Concluding that violations of the confidentiality right of privacy may be actionable under § 1983 does not, however, end our inquiry. Although defendants are wrong in arguing that *Paul* prohibits any privacy § 1983 action, we conclude that they correctly argue that the Scheetzes did not have a constitutionally protected privacy interest in the information they divulged in a police report.[5] We note that the question of whether a federal constitutional right to privacy has been violated is a distinct question from whether a federal statutory right to privacy (*i.e.* under the Freedom of Information Act) or a state common law right to privacy has been violated.

---

**4.** *Paul* can be reconciled with *Whalen* since the information at issue in *Paul* (the fact of plaintiff's arrest for shoplifting) is not the kind of information entitled to constitutional protection.

**5.** Our conclusion is bolstered by a line of cases refusing to recognize a section 1983 action because the type of information made public is not "private" in the *constitutional* sense. *See, e.g., Wade v. Goodwin*, 843 F.2d 1150 (8th Cir.), *cert. denied*, 488 U.S. 854, 109 S.Ct. 142, 102 L.Ed.2d 114 (1988) (publication of plaintiffs name on a list of "survivalists" did not establish

a constitutional invasion of privacy since privacy only protects the most intimate matters); *Davis v. Bucher*, 853 F.2d 718, 721 (9th Cir.1988) (concluding that actions of correctional officer, in exhibiting nude photos of inmate's wife, do not involve type of malfeasance "which demands a constitutional response"); *Pesce v. J. Sterling Morton High School*, 830 F.2d 789, 797 (7th Cir.1987) (state statute that required school psychologist to disclose that student had engaged in sexual relations with teacher did not violate federal right to confidentiality).

*United States Dept. of Justice v. Reporters Committee for Freedom of the Press,* 489 U.S. 749, 109 S.Ct. 1468, 1476 n. 13, 103 L.Ed.2d 774 (1989). Reference to state law on confidentiality is not particularly useful to this analysis, so case law cited by the parties as to Pennsylvania confidentiality law cannot control the *federal* constitutional right.

█ We conclude that the information contained in a police report is not protected by the confidentiality branch of the constitutional right of privacy. Although the outlines of the confidentiality right are not definite, the information that has been protected in other cases was information that the disclosing person reasonably expected to remain private. In reporting this potential crime to the police, Rosann Scheetz could not reasonably expect the information to remain secret. The police could have brought charges without her concurrence, at which point all the information would have wound up on the public record, where it would have been non-confidential. *See Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 494–495, 95 S.Ct. 1029, 1045–46, 43 L.Ed.2d 328 (1975) (privacy interest fades when information is in the public record). This information is not like medical or financial records (which have been accorded some constitutional protection by this court, *see Fraternal Order of Police, supra*) where there is a reasonable expectation that privacy will be preserved. When police are called, a private disturbance loses much of its private character.[6] We conclude that the information Rosann Scheetz disclosed in the police reports is not constitutionally protected.

### III.

For the foregoing reasons, we will affirm the district court's grant of summary judgment to the defendants.[7]

MANSMANN, Circuit Judge, dissenting.

As aptly articulated in *Paul v. Davis,* the delineation of the constitutional right to privacy "def[ies] categorical description." 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976). *See* Kramer, *The Full–Court Press: Sacrificing Vital Privacy Interests on the Altar of First Amendment Rhetoric,* 8 Cardozo Arts & Entertainment L.J. 113, 118 (1989) (quoting one commentator as stating "[p]erhaps privacy is not given the recognition it deserves as a fundamental value simply because the concept is so difficult to formulate or justify in non-subjective terms") (footnote omitted). Despite the difficulty in drawing this subjective line, I believe that the Scheetzes have presented a constitutionally protected privacy interest in the details of their marital disturbance and counseling.

Thus, I would then analyze The Morning Call's first amendment right to publish this private information, considering the public significance of the information, and would also address the fact that the confidential information was unlawfully acquired. I concur with the district court's determination that the first amendment values outweigh the Scheetzes' privacy interest, but I would vacate the order of the district court and remand for trial, nevertheless, because if proven, the fact that The Call knowingly acquired the information in an unlawful manner should permit the plaintiffs to recover. For these reasons, I respectfully dissent.

### I.

As the majority notes, we have recognized a constitutionally protected privacy

---

6. Of course the police may have an interest in keeping investigative information private. They may protect this interest by appropriate regulation. The police's interest in the privacy of the information should not be confused with the individual's interest in the information he or she reports.

7. The Scheetzes also claim the defendants' actions interfered with their autonomy privacy

right. The Scheetzes' argument is that they have an autonomy right to seek marital counseling, and that the defendants have "chilled" that right by publishing the article. The Scheetzes claim that they would hesitate before seeking further counseling out of fear that the counseling would be reported in the newspaper. We have examined this claim and find it to be without merit.

interest in such personal information as an employee's medical records. *United States v. Westinghouse Electric Co.,* 638 F.2d 570 (3d Cir.1980). *See also Fadjo v. Coon,* 633 F.2d 1172 (5th Cir.1981) (subpoenaed testimony of information concerning "the most private details of [plaintiff's] life"); *Plante v. Gonzalez,* 575 F.2d 1119 (5th Cir.1978) (personal financial information), *cert. denied,* 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979). *But see J.P. v. De Santi,* 653 F.2d 1080 (6th Cir.1981) (not recognizing a constitutional privacy right in disclosure of confidential juvenile social history records).

Nonetheless, the majority did not find a privacy interest in "the information contained in the police report." I agree that some of the information contained in the police report, specifically that information contained in the "Offense/Incident Report," is not protected under a constitutional privacy interest. *See Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) (no liability for disclosure of a rape victim's name already disclosed in the public record). Because the "Offense/Incident Report" is classified as a public document under the police department's policy, that information was not treated as confidential. In fact, Kenneth Scheetz admitted that he considered this information to be a matter of public record. Moreover, one who reports an incident to the police cannot reasonably expect that certain threshold factual items—the occurrence of an incident, its category or general description, the time, address and identity of the complainant—will remain confidential.[1] Therefore, the information contained in the "Offense/Incident Report" is not information protected from disclosure by a constitutional privacy interest. *See also* Prosser, *Privacy,* 48 Calif.L.Rev. 383, 395–96 (1960) (noting "the effect of the fact that the matter made public is already one of public record. If the record is a confidential one, not open to public inspection ... it is not public ..." for purposes of the

tort of invasion of privacy) (footnote omitted). I therefore agree with the majority that there is no privacy interest in the facts, contained in the "Offense/Incident Report," that "Mrs. Scheetz" reported a "disturbance" at "2616 Appel St. SW, Allentown" on January 15, 1988, at 10:06 p.m., described as a "husband/wife dispute settled when wife left."

Some of the information reported by The Call, however, was contained only in *confidential* portions of the police report entitled "Investigative Supplements" and was not discernable from the public portion of the report. That information detailed the private facts of the Scheetzes' marital counseling and precise details of their marital disturbance, including a description of Rosann's injuries and her statements. Since this information is clearly confidential, I would then examine the nature of the Scheetzes' privacy interest in keeping it confidential.

Identified in *Whalen v. Roe,* as "the individual interest in avoiding disclosure of personal matters," the confidentiality branch of the constitutional right to privacy has been found applicable to disclosure of the details of one's personal life. 429 U.S. at 599, 97 S.Ct. at 876. *See, e.g., Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia,* 812 F.2d 105 (3d Cir.1987) (medical and financial information); *Westinghouse,* 638 F.2d at 570 (employee's medical records). In *Whalen,* the Court quoted from Justice Brandeis's dissent in *Olmstead v. United States* to characterize the privacy interest as " 'the right to be let alone' as 'the right most valued by civilized men.' " 429 U.S. at 599 n. 25, 97 S.Ct. at 876 n. 25 (quoting *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting)). Another formulation suggests that the confidentiality branch consists of "the right of an individual not to have his private affairs made public by the government." *Whalen,* 429 U.S. at 599 n. 24, 97 S.Ct. at 876 n. 24 (quoting The

---

**1.** Indeed, much of this information is available over police scanners and is routinely published in local newspapers.

Private I, The University of Chicago Magazine, 7, 8 (Autumn 1976)).

"In determining whether information is entitled to privacy protection, we have looked at whether it is within an individual's reasonable expectations of confidentiality." *Fraternal Order of Police*, 812 F.2d at 112. Further, "[t]he more intimate or personal the information, the more justified is the expectation that it will not be subject to public scrutiny." *Id.* at 812–13. Determining that prior caselaw had established that medical records were protected by a constitutional privacy interest in *Fraternal Order of Police*, we had no occasion to more fully explore the factors to consider in evaluating a reasonable expectation of confidentiality.[2]

One factor I believe relevant to whether the Scheetzes had a reasonable expectation of privacy is the extent to which they limited their own disclosure of the marital disturbance and counseling so as to prevent public knowledge. Confiding in one's friends, family, or religious leader, for example, would not suffice to diminish a reasonable expectation of privacy against disclosure to the public at large. Disclosing information beyond one's close confidantes, however, would reduce one's reasonable expectation of privacy.

There is evidence in the record that the Scheetzes' marital disharmony was familiar to their neighbors. Some years before the marital disturbance at issue, when the Scheetzes lived in another neighborhood, a neighbor had summoned the police to what

Rosann Scheetz characterized as a "shouting match." On January 14, 1988, the date of the incident reported by The Call, two police cruisers responded to Rosann's call and the first responding officer testified that he found Rosann crying outside, some 25 yards from the house. Additionally, during a previous domestic disturbance the Scheetz children had spent the night at the home of the chief of police—also a neighbor—and when Kenneth and Rosann had previously separated for a few weeks, Kenneth stayed with the chief. Given this disclosure of these limited details, the Scheetzes may not have had a reasonable expectation of confidentiality concerning disclosure to the press by a neighbor of incidents of domestic disturbances.

In addition, the marital discord was well-known to Kenneth Scheetz's fellow police officers. One officer testified in his deposition that, after the January incident, "talk [around the police department] was Scheetzie beat up his wife again. You know, it was no big thing." Another officer conveyed his opinion that the Scheetzes were thought to have a "fairly serious problem" and there was talk both of previous episodes and the possibility of recurrences. In a phone call to a superior officer on the day following the reported incident, Kenneth explained that he and Rosann had had a fight, that she had left, and that he would not report for work because he wanted to find her. Kenneth also told other police officers and other unspecified persons about the incident.[3] The Scheetzes testi-

---

**2.** The reasonable expectation test also closely resembles the test employed when determining a right of privacy under the common law tort of invasion of privacy. *See* Restatement (Second) of Torts § 652D (1977) (defining the tort of invasion of privacy through the publication of private facts as the publication of a matter concerning the private life of another that is highly offensive to a reasonable person and that is not of legitimate public concern); Prosser, *supra*, at 391 (under the common law tort of the invasion of privacy, an intrusion must be "something which would be offensive or objectionable to a reasonable [person]").

This common law right of privacy to protect personal facts from public disclosure was first espoused in the landmark law review article *The Right to Privacy*, 4 Harv.L.Rev. 193 (1890), by Samuel Warren and Louis Brandeis, and

appears to have informed the identification of the confidentiality branch of the right to privacy in *Whalen*.

In a subsequent article Professor Prosser divided this common law tort of invasion of privacy into four categories: (1) intrusion upon the plaintiff's seclusion or solitude, or into his private affairs; (2) appropriation of the plaintiff's name or likeness; (3) publicity that places the plaintiff in a false light; and (4) public disclosure of embarrassing private facts about the plaintiff. Prosser, *Privacy*, 48 Calif.L.Rev. 383, 389 (1960).

**3.** Kenneth Scheetz also testified that he discussed the incident with his mother and a marriage counselor. Because he arguably had a reasonable expectation of confidentiality in

fied that several police officers called on them informally to lend support. Thus, had The Call received the confidential information by interviewing Kenneth's fellow police officers, the Scheetzes' privacy interest would be negligible.

As well, Rosann Scheetz disclosed information concerning the incident. The morning after the incident, when she left the police department at 6:00 a.m., Rosann ate breakfast at a diner, and then removed her children from their schools. She arrived at home where Kenneth observed that she had blood on her sweatshirt, a "mark" on her cheek, and a "red area" around her left eye—all stemming from the night before.[4] Rosann also phoned her employer, an audiologist, explaining that she would not be reporting for work because she and her husband had had a "disagreement" that they needed to work out. After a weekend at home, Rosann returned to work; to patients, she blamed her dog for her visible injuries. Had The Call obtained its information from a nonprivileged source to whom Rosann disclosed information, the Scheetzes' privacy interest would also be negligible.

As the record discloses, the Scheetzes did not scrupulously guard the privacy of their marital discord from their family, neighbors, and co-workers. Nevertheless, neither did they take any action to disseminate these private facts in a public forum. Rosann did not press criminal charges, seek a Protection From Abuse Act order, or pursue departmental censure of Kenneth. The majority suggests that because the information could have been publicly disclosed, the Scheetzes had no privacy interest. While it is true that criminal charges could have been brought without Rosann's con-

currence, it does not necessarily follow that in spite of the fact that she declined to press charges or take alternative legal action, and no legal action ensued, Rosann Scheetz could have reasonably expected public disclosure of the confidential information that had remained quietly dormant in confidential police department reports.

This is especially true where the public disclosure occurred 16 months after the incident. *See, e.g., Briscoe v. Reader's Digest Ass'n,* 4 Cal.3d 529, 483 P.2d 34, 93 Cal.Rptr. 866 (1971) (common law right to privacy infringed by publication of truck hijacking conviction of 11 years ago); *Melvin v. Reid,* 112 Cal.App. 285, 297 P. 91 (1931) (liability for common law invasion of privacy imposed upon producers of movie that revealed prior life of prostitution and crime of woman who had long since taken a new name and established a respectable life).[5]

Thus, this case squarely raises an additional factor to consider, namely, "[t]he difficult question ... as to the effect of lapse of time, and the extent to which forgotten records, as for example of a criminal conviction, may be dredged up in after years and given more general publicity." Prosser, *supra,* at 396. Because this confidential information had lain undisclosed in the confidential police department files for over a year and Rosann Scheetz had not pursued any legal action, the Scheetzes could reasonably have expected that the confidential information would never be publicly disclosed. In light of this delay, I cannot agree with the majority's otherwise appropriate assertion that "[w]hen police are called, a private disturbance loses much of its private character."

these sources, this disclosure may not have jeopardized his privacy interest.

4. Although there is conflicting testimony concerning the severity of Rosann's injuries, nevertheless, at a minimum she had discoloration around one eye, a small v-shaped laceration on her jaw bone, and some other marks on her face. She testified that she felt "light headed" enough the next week to visit a doctor about the lump on the back of her head, allegedly caused by Kenneth "pushing" her against a wall.

5. Clearly, had the authorities acted, the Scheetzes would have lost any reasonable expectation of privacy; moreover, any privacy interest asserted by them would be heavily outweighed by the state's legitimate interest in prosecuting crime (in the case of criminal charges), protecting victims of domestic violence (had there been proceedings under the Pennsylvania Protection From Abuse Act), or maintaining police discipline (had the department instituted disciplinary proceedings against Kenneth).

Information that has remained confidential over a period of time, absent any legal action, can reasonably be expected to recede from public notice.[6]

## II.

Against the Scheetzes' constitutional privacy interest, The Morning Call's free press right guaranteed by the first amendment must be balanced. We have not had previous occasion to balance a constitutional privacy interest against a first amendment interest. *Cf. Fraternal Order of Police*, 812 F.2d at 105 (balancing a constitutional privacy interest against disclosure sought by the government for application for new job openings); *Westinghouse*, 638 F.2d at 570 (balancing employees' constitutional privacy interest in medical records against a disclosure sought pursuant to an OSHA investigation). Nor has the Supreme Court squarely addressed the appropriate balancing test. *Cf. The Florida Star v. B.J.F.*, 491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) (denying civil liability premised upon a state statute designed to protect the privacy of a rape victim's name); *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d

399 (1979) (no liability for publication of juvenile suspect's name protected by state statute where the paper independently and lawfully obtained the information); *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) (considering access to tape recordings admitted into the public record); *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978) (criminal sanctions for disclosure of information concerning judicial investigations guaranteed confidentiality under state statute found violative of the first amendment); *Oklahoma Publishing Co. v. District Court*, 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977) (no liability for publication of juvenile's name, protected by state statute and protective order, where hearing was open to the public); *Cox Broadcasting*, 420 U.S. at 469, 95 S.Ct. at 1029 (holding that the first amendment forbade a state from prohibiting publication of a rape victim's name that had been released into the public record); *Whalen*, 429 U.S. at 589, 97 S.Ct. at 869 (disclosure sought under state statute). Additionally, the tests employed when balancing first amendment values against common law privacy interests vary widely.[7]

---

**6.** I confine my analysis of the Scheetzes' privacy interest to the situation raised here in which the reporter's source was a copy of confidential as well as non-confidential portions of the police report. I do not address the outcome of a different situation where the reporter may have derived information contained on the confidential portions of the report from another source, *e.g.*, a neighborhood "gossip," a confidante of the Scheetzes, or another source that the Scheetzes may not have reasonably expected to keep their secrets. Here the police department policy established the confidentiality of certain information, making reasonable the Scheetzes' privacy expectations, absent disclosure from another source.

**7.** Several tests have been employed to define the first amendment value, styled "newsworthiness," against a common law privacy right. *See* Note, *Florida S[tar] v. B.J.F.: The Right of Privacy Collides with the First Amendment*, 76 Iowa L.Rev. 139, 151–52 & n. 103 (1990). The Restatement (Second) of Torts § 652D (1977) promotes the application of a community mores standard, applying a standard of offensiveness as determined by community mores. Note, *The Right of Privacy Collides, supra,* at 151 n. 103. A

different standard used in California contains a three-part inquiry. "[First,] the social value of the facts published, [second,] the depth of the article's intrusion into ostensibly private affairs, and [third,] the extent to which the party voluntarily acceded to a position of public notoriety." *Diaz v. Oakland Tribune, Inc.*, 139 Cal.App.3d 118, 132, 188 Cal.Rptr. 762, 772 (1983). Another standard requires a logical nexus between the information disclosed and a matter of legitimate public interest. *See e.g., Ross v. Midwest Communications, Inc.*, 870 F.2d 271, 275 (5th Cir.), *cert. denied*, 493 U.S. 935, 110 S.Ct. 326, 107 L.Ed.2d 316 (1989); *Campbell v. Seabury Press*, 614 F.2d 395, 397 (5th Cir.1980).

Yet another standard, delineated as the "demonstrative public interest" standard, requires that the press demonstrate some public interest. *See, e.g., McNutt v. New Mexico State Tribune Co.*, 88 N.M. 162, 167, 538 P.2d 804, 807 ("it is neither feasible nor desirable for a court to make a distinction between news for information and news for entertainment"), *cert. denied*, 88 N.M. 318, 540 P.2d 248 (1975). This standard has been criticized as a "leave-it-to-the-press model." Zimmerman, *Requiem for a Heavyweight: A Farewell to Warren and Brandeis's Privacy Tort*, 68 Cornell L.Rev. 291, 353–

Given the facts presented by this case, however, I need not delineate the precise parameters of the appropriate balancing test to be applied and I would leave that refinement for future cases. Here, three facts simplify the resolution of this case.

The first two facts place the Scheetzes' marital disturbance within the realm of public significance protected by the first amendment. First, Kenneth Scheetz's occupation as a police officer renders his domestic conduct, bordering on the criminally actionable, a matter of public significance and concern. Kenneth's position as a law enforcement officer focuses the distinction between " '[p]ublic interest,' taken to mean curiosity ... [and] 'public Interest,' taken to mean value to the public of receiving information of governing importance." Bloustein, *The First Amendment and Privacy: The Supreme Court Justice and the Philosopher*, 28 Rutgers L.Rev. 41, 56–57 (1974). Because his occupation in the field of public safety implicates legitimate public interest in his capacity to perform his duties, this case is closer to the latter pole of the continuum between gossip and information of governing importance. In the landscape of defamation, the law similarly provides for differing standards of proof for public and private figures. *Compare Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (public figures must prove by clear and convincing evidence that an allegedly defamatory statement was made with knowledge of its falsity or in reckless disregard of its truth or falsity) *with Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (private figures need to show only by a preponderance of the evidence that defamatory statements were negligently made).

Second, and perhaps more importantly, the police officers and the police chief who nominated Kenneth Scheetz for the "Officer of the Year Award" were aware of the previous marital incident. The confidential information concerning the Scheetzes' domestic violence, combined with the award to Kenneth, bears upon matters of public significance insofar as it reflects upon the police department. That the department would recommend, for the Officer of the Year Award, an officer whose domestic violence was grist for the police department "rumor mill," could raise public concern regarding police sensitivity to domestic violence issues.[8] The information revealed by the police reports arguably could serve to reflect police attitudes toward domestic violence, about which the local community has a strong public interest. "Whatever differences may exist about interpretation of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Landmark Communications*, 435 U.S. at 838, 98 S.Ct. at 1541 (quoting *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966)).

At this juncture, the third, and particularly troublesome, factual element of this case becomes determinative in my view: The Morning Call's allegedly unlawful acquisition of the confidential portions of the police report. We have little guidance as to how to factor in this element; the Su-

---

55 (1983). Additional factors contributing to public significance include statements of policy or law, the plaintiff's "public figure" status, the passage of time, and the location of the event giving rise to the private fact. Note, *The Right of Privacy Collides, supra*, at 152 n. 103 (citing cases).

**8.** The public interest in this case is arguably even stronger than that articulated in *Florida Star*, 491 U.S. at 524, 109 S.Ct. at 2603. There the Court found an important, albeit general, public interest in the disclosure of information concerning a rape without further analyzing whether the name of a rape victim was also an item of public significance. *Florida Star*, 491

U.S. at 536–37, 109 S.Ct. at 2610–11. In his dissent, Justice White challenged the utility of a rape victim's name to the kind of public knowledge and discourse protected by the first amendment. *Id.* at 550–52, 109 S.Ct. at 2618–19 (White, J., dissenting).

Here, because the public significance of the Scheetzes' marital disturbance is related to the publicity attending the award given to Kenneth Scheetz, their identity triggers the public significance of the private information. Thus this case does not implicate the question of whether the plaintiffs' names, as distinguished from the other facts of public significance, warrants a distinct privacy interest.

preme Court has expressly reserved the question. *See Florida Star,* 491 U.S. at 535 n. 8, 109 S.Ct. at 2610 n. 8 ("[t]he *Daily Mail* principle does not settle the issue of whether, in cases where information has been acquired *unlawfully* by a newspaper or by a source, government may ever punish not only the unlawful acquisition, but the ensuing publication as well"); *Landmark Communications,* 435 U.S. at 837, 98 S.Ct. at 1540 ("[w]e are not here concerned with the possible applicability of the statute to one who secures the information by illegal means and thereafter divulges it").

More recently, however, the Court hinted that the *Daily Mail* line of cases required that "the truthful information sought to be published must have been lawfully acquired." *Cohen v. Cowles Media Co.,* — U.S. ——, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991) (holding that the first amendment does not prohibit a plaintiff from recovering damages under state promissory estoppel law against a newspaper for publication of information). The newspaper published the name of a political source in violation of its reporter's promise to preserve the confidentiality of the source. *Id.* at ——, 111 S.Ct. at 2516–17. Relying on cases eschewing the premise that the first amendment grants the press immunity from liability arising out of laws of general applicability, the Court concluded that "enforcement of such general laws against the press is not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations." *Id.* at ——, 111 S.Ct. at 2518. I find instructive this additional statement:

Also, it is not at all clear that Respondents obtained Cohen's name "lawfully" in this case, at least for purposes of publishing it. Unlike the situation in *The Florida Star,* where the rape victim's name was obtained through lawful access to a police report, respondents obtained Cohen's name only by making a promise which they did not honor. The dissenting opinions suggest that the press should not be subject to any law, including copyright law for example, which in any fashion or to any degree

limits or restricts the press' right to report truthful information. The First Amendment does not grant the press such limitless protection.

*Id.* at ——, 111 S.Ct. at 2519. Thus, the Court declined to label "lawful" the acquisition of information pursuant to a promise later broken. Clearly, in our case the acquisition of information is at least one degree closer to being unlawful, because *if proven,* The Call and its reporter would have known that the confidential report had been unlawfully acquired.

We recognize that the parties dispute whether Terry Mutchler, the reporter who obtained the confidential reports, actually took them herself or simply received copies from an unnamed state actor. While the presence of a state actor is necessary here to the Scheetzes' section 1983 cause of action, whether The Call's reporter or the state actor took the report does not alter my determination of the first amendment value. There is evidence to show that Terry Mutchler was notified before the offending article went to press that the reports were confidential and that her possession of them was unlawful. If this fact is proven, The Call then would have been on notice that the reports were in fact confidential and unlawfully acquired.

I would conclude that the fact that The Call acquired private confidential information concerning the Scheetzes' personal life by unlawful means militates against awarding The Call the benefits of its, or its agents', wrongdoing even affording great weight to first amendment values. As this case demonstrates, The Call had ample lawful means of acquiring the information. Had The Call obtained the same information by any of these lawful means, for example, by interviewing sources to whom the Scheetzes had confided the information or pursuing police disclosure of the confidential report through the Pennsylvania Right to Know Law, 65 Pa.Cons.Stat.Ann. § 66.1, *et seq.* (Purdon's 1959 & Supp.1991), then it would not have jeopardized its first amendment interest. *See Smith v. Daily Mail,* 443 U.S. at 97, 99 S.Ct. at 2667 (prohibiting liability where the newspaper ob-

tained confidential information by interviewing witnesses). Drawing this bright line at unlawful acquisition eliminates the need to establish criminal liability in each case. This rule would also serve, in the absence of internal discipline by the press, to enhance the public interest in accurate, verified reporting as well as encouraging lawful acquisition of information.

Weighing the balance in favor of the Scheetzes' privacy interest because The Call unlawfully obtained the information also draws a bright line eliminating the need for ad hoc editorial decision-making that triggers the specter of self-censorship antithetical to first amendment values. *See Ollman v. Evans*, 750 F.2d 970, 978 (D.C.Cir.1984) ("predictability of decisions, which is of crucial importance in an area of law touching upon First Amendment values, is enhanced when the determination is made according to announced legal standards and when a body of public case law furnishes published examples of the manner in which these standards are to be applied"), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985).

This weighing of privacy and first amendment interests comports with the Scheetzes' reasonable expectations of privacy and the steps that they, or others similarly situated, might take to ensure the confidentiality of private facts.

In sum, where confidential information, protected by the constitutional guarantee of privacy, is *unlawfully* acquired, I would hold that the first amendment does not afford the press a defense against civil liability. I would vacate the summary judgment order and remand for further proceedings. Thus, I respectfully dissent.