[No. A058902. First Dist., Div. Five. Feb. 8, 1993.]

MARIN INDEPENDENT JOURNAL, Petitioner, v.
THE MUNICIPAL COURT FOR THE MARIN JUDICIAL DISTRICT OF
MARIN COUNTY, Respondent;
THE PEOPLE et al., Real Parties in Interest.

**COUNSEL**

Steinhart & Falconer, James F. Brelsford and Mary Paul Nash for Petitioner.

No appearance for Respondent.

Jerry R. Herman, District Attorney, Edward S. Berberian and Judith T. Brown, Deputy District Attorneys, Tamburello, Hanlon & Waggener, Kathleen Callaghan and Stuart Hanlon for Real Parties in Interest.

## OPINION

HANING, J.—California Rules of Court, rule 980[1] absolutely prohibits photography or electronic media coverage of courtroom proceedings unless authorized by written order. In this case we are asked to decide whether the confiscation by the court of photographic negatives of a criminal defendant, taken by a journalist in the courtroom in violation of rule 980, runs afoul of the First Amendment as a prior restraint on speech. Under the circumstances of this case we conclude that it does not, and that the trial court acted well within its discretion in seizing the film.

Petitioner Marin Independent Journal, a daily newspaper, seeks relief by extraordinary writ from an order of respondent municipal court denying a motion for return of a roll of film confiscated from a Journal photographer who took pictures of a suspect in violation of rule 980. Both parties to the underlying criminal proceeding, the People and the suspect, Maurice H. (hereafter also referred to as the suspect), had opposed courtroom photography and now appear in this court as real parties in interest arguing in support of the municipal court's order. Having issued an order to show cause in lieu of an alternative writ and heard oral argument, we deny the requested relief.

### FACTS AND PROCEDURAL HISTORY

In spite of petitioner's persistent urging of those limited facts which it perceives as supporting its position, we are required to view the evidence in the light most favorable to the trial court's decision. (See *Langford* v. *Superior Court* (1987) 43 Cal.3d 21, 28 [233 Cal.Rptr. 387, 729 P.2d 822], cert. den. (1987) 484 U.S. 824 [98 L.Ed.2d 49, 108 S.Ct. 87]; Cal. Civil Writ Practice (Cont.Ed.Bar 1987) § 10.53, p. 426.)

This case arises from the tragic shooting death of a young boy at a Marin City "rap" festival on August 22, 1992. According to press reports, the victim was riding his bicycle near the festival grounds when an argument broke out nearby between a performer and autograph seekers. Guns were drawn and shots were fired. The young victim was struck in the head by a stray bullet and died. The killer's identity was undetermined, and flyers were circulated by the community calling on anyone who witnessed the killing to come forward.

On August 24 real party Maurice H. was arrested as a suspect in the killing. He was scheduled for his first court appearance in municipal court that day. Prior to the appearance petitioner submitted a form requesting the

---

[1]All further references to rules are to the California Rules of Court.

court's authorization for courtroom photography under rule 980. The request was discussed in open court at the hearing. Both the prosecution and the defense agreed that photography should be refused, because the key issue was identification, and a lineup was slated for that evening. The district attorney noted that the case was still under investigation, and that publication of photographs could taint the identification process. The court (Presiding Judge Graham) denied the request for the reasons stated by the parties. Petitioner's news photographer was present in court during the argument on the request.

The suspect was held for arraignment the next day, August 25. Petitioner submitted a second rule 980 request to Judge Graham requesting still photography authorization for the arraignment which was not acted upon, apparently because the arraignment was scheduled before a different judge. When petitioner learned the arraignment was scheduled before visiting Judge Albert C. Wollenberg Jr., it submitted a third rule 980 request to him. This third request may have been submitted at the last minute; it never reached Judge Wollenberg prior to the arraignment.

A few minutes before the arraignment, the photographer and a Journal reporter approached the metal detector outside Judge Wollenberg's courtroom; the photographer was carrying her camera. The testimony of two court bailiffs established that the photographer was aware she did not have authorization to take photographs. The bailiff stationed at the detector, Deputy Shaller, testified that on the photographer's approach he radioed Judge Wollenberg's bailiff, Deputy Ford, and asked if the judge had approved the rule 980 request. Ford checked with the judge and was told there was no court order approving photography; indeed, the judge had not even seen the request form. *Ford went out to the metal detector and informed the photographer and the reporter that there was no court permission to take photographs.* Shaller overheard Ford informing the photographer she lacked authorization to photograph the proceedings.

The photographer testified that when she entered the courtroom, she was given a "wink and a nod" by the courtroom bailiff, Deputy Holloway, to sit in the jury box. Petitioner contends that this nonverbal communication from the bailiff constituted an official communication that the photographer's rule 980 request was approved and she therefore had permission to photograph the proceedings. The photographer was seated in the jury box when the arraignment commenced, and snapped three still pictures of the suspect. Both the People and the defense objected, and Judge Wollenberg ordered his bailiff to seize the photographer's film.

Petitioner filed a motion for return of the film, which was scheduled to be heard by Judge Graham as Presiding Judge. The photographer and Deputies

Ford and Shaller testified as set forth above. It is undisputed that there was never a written or even an oral order allowing photography under rule 980. At the conclusion of the hearing Judge Graham stated he did not "have to get to the issue of intentional or accidental violation" of the rule. "I think [rule] 980 is clear on its face and said unequivocally there won't be any photography in the court room [*sic*] without a pre-existing court order. . . . [I]t would make a mockery of [rule] 980 if I were to conclude that whereby accident or intent someone comes in and violates the rules, the court does not have the power to retain the product of that exercise." Without reaching any Sixth Amendment interest on real parties' part, the court ruled it "will not release the film in the interest of preserving order and control and respect in the court proceedings" due to "a clear violation of the law [i.e., rule 980]."

The suspect has since been released for lack of evidence. The only pictures of the suspect, who has left the area, are on the film. There are no other pictures on the subject roll of film. ▆▆ ▆ This petition followed, seeking an extraordinary writ to compel the municipal court to grant the motion to return the film.[2]

## DISCUSSION

The resolution of this issue involves a consideration of two basic, and frequently antagonistic, constitutional rights: the free speech right of the press, and the right to a fair trial guaranteed to the accused in a criminal case. Since it falls ultimately on the courts to secure and protect these rights, we are also obliged to consider the right, if not the duty, of the court to guard the rights of the parties appearing before it, to maintain order in its proceedings, and in this regard to enforce its own legitimate orders and the rules of court. ▆ In so doing we observe that few rights are absolute—they all have boundaries, and those boundaries usually arise in the area where they begin to intrude into areas secured by other competing rights. These boundaries are not always marked by bright lines, and are generally best defined on a case-by-case basis. Contrary to petitioner's view, this also applies to First Amendment rights. (See *Cohen* v. *Cowles Media Co.* (1991) 501 U.S. __ [115 L.Ed.2d 586, 111 S.Ct. 2513] [exercise of free speech]; *Employment Div., Ore. Dept. of Human Res.* v. *Smith* (1990) 494 U.S. 872 [198 L.Ed.2d 876, 110 S.Ct. 1595] [exercise of religion].)

▆ Petitioner challenges the confiscation of the film as an unconstitutional prior restraint of speech, in violation of the First Amendment. Petitioner complains that the municipal court has not only prevented publication

---

[2]The petition bypasses the superior court, but that is permissible when First Amendment issues are at stake and there is a need for expedited appellate review. (See, e.g., *KFMB-TV Channel 8* v. *Municipal Court* (1990) 221 Cal.App.3d 1362 [271 Cal.Rptr. 109]; *KCST-TV Channel 39* v. *Municipal Court* (1988) 201 Cal.App.3d 143 [246 Cal.Rptr. 869].)

of photographs of the suspect but has physically seized the material to be published, which, like the seizure of allegedly obscene films, is the ultimate prior restraint. We conclude that the seizure does not violate the Constitution under the circumstances of this case, and that the court's conduct is justified because the photographs were acquired in violation of law.

■ The media has the right to attend and report on open judicial proceedings (*Nixon* v. *Warner Communications, Inc.* (1978) 435 U.S. 589, 609-610 [55 L.Ed.2d 750, 586-588, 98 S.Ct. 1306]), but does *not* have a constitutional right to photograph or otherwise electronically record them. Electronic recording of judicial proceedings is subject to the discretion of the court. (*Id.*, at p. 610 [55 L.Ed.2d at p. 587]; see *Chandler* v. *Florida* (1981) 449 U.S. 560, 569 [66 L.Ed. 740, 748, 101 S.Ct. 802]; *Estes* v. *Texas* (1965) 381 U.S. 532, 587 [14 L.Ed.2d 543, 583, 85 S.Ct. 1628] (Harlan, J., concurring).)

In California, the photographing or electronic media recording of courtroom proceedings is governed by rule 980, which as noted above permits such recording only on written order of the court. ". . . The court may refuse, limit or terminate film or electronic media coverage in the interests of justice to protect the rights of the parties and the dignity of the court, or to assure the orderly conduct of the proceedings. This rule does not otherwise limit or restrict the right of the media to cover and report court proceedings." (Rule 980(b).) Rule 980 is consistent with the principle that electronic media coverage of proceedings "is a right created by consent of the judiciary, which has always had control over the courtrooms . . . ." (*Westmoreland* v. *Columbia Broadcasting System, Inc.* (2d Cir. 1984) 752 F.2d 16, 24, cert. den. (1985) 472 U.S. 1017 [87 L.Ed.2d 614, 105 S.Ct. 3478], fn. omitted.) "Notwithstanding the[] awareness of the importance of the considerations underlying the First Amendment, California's promulgation of rule 980 reflects a commitment to the court's inherent right to control access." (*KFMB-TV Channel 8* v. *Municipal Court, supra*, 221 Cal.App.3d at p. 1366.)

■ At the outset we note that the municipal court did nothing to prevent petitioner from publishing an account of the judicial proceedings; nor did the court attempt to prevent publication of photographs lawfully obtained with authorization under rule 980, or otherwise legitimately obtained outside the courtroom. (See *KFMB-TV Channel 8* v. *Municipal Court, supra*, 221 Cal.App.3d 1362.) Such conduct clearly would constitute a prior restraint of protected speech. Rather, the court in this case merely took a legitimate step to enforce the rules of court and the dignity and decorum of its proceedings. The seizure of the film simply enforced rule 980 by precluding publication of photographs that should never have been taken and which

were obtained without permission. Qualitatively, the seizure is little different than a refusal of permission to photograph in the first instance. Since courtroom photography can be completely banned by a trial court, we seriously question whether confiscation of photographs which should never have been taken and which could have been, as they were in this case, totally disallowed, is a prior restraint of protected speech.

Regardless of the trial court's failure to reach the issue of the photographer's intent, the record clearly shows that petitioner's photographer knew she had no permission to take photographs, had in fact previously been denied permission, but deliberately violated rule 980 in order to photograph the proceedings. Given the fact that the first rule 980 request had been denied and the second had not been ruled upon, and the photographer had not received permission from the trial judge regarding the third request then pending, it is at best disingenuous for her to contend she believed she had authorization to take photographs.

Assuming, however, that the seizure is a prior restraint, we conclude it is justified because the photographs were obtained unlawfully in a deliberate violation of a rule of court. ▆▆ Of course, a prior restraint of speech is generally subject to close judicial scrutiny, and is permissible only in the most extraordinary circumstances. (*New York Times Co.* v. *United States* (1971) 403 U.S. 713, 714 [29 L.Ed. 822, 824-825, 91 S.Ct. 2140]; *KCST-TV Channel 39* v. *Municipal Court, supra,* 201 Cal.App.3d at p. 146.) ▆▆ However, we think that existing law provides that a prior restraint is permissible when information has been unlawfully obtained by the news media under these circumstances.

In the context of reporting on judicial proceedings, numerous decisions of the United States Supreme Court have invalidated prior restraints or other less severe sanctions on publication of information *lawfully* obtained, when the information was supposed to be kept secret but was inadvertently revealed to the press or public. In *Cox Broadcasting Corp.* v. *Cohn* (1975) 420 U.S. 469 [43 L.Ed.2d 328, 95 S.Ct. 1029], the court held that a newspaper may not be sued for invasion of privacy for the publication of the name of a rape victim in violation of statute. The newspaper obtained the victim's name from indictments which were public documents and which were given to a reporter for inspection by a court clerk. "[T]he First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection." (*Id.,* at p. 495 [43 L.Ed.2d at pp. 349-350].) In *Nebraska Press Assn.* v. *Stuart* (1976) 427 U.S. 539 [49 L.Ed.2d 683, 96 S.Ct. 2791], the court invalidated a trial court order

preventing members of the press from publishing certain information about a high-profile murder case obtained from press attendance at an open preliminary hearing.

In *Oklahoma Publishing Co.* v. *District Court* (1977) 430 U.S. 308 [51 L.Ed.2d 355, 97 S.Ct. 1045], a trial court enjoined members of the news media from publishing the name or picture of a minor child who was the subject of a juvenile court proceeding. By statute, juvenile court proceedings were private unless specifically ordered to be conducted in public. Nevertheless, and with no indication that the trial judge expressly ordered a public hearing, members of the press were permitted to attend with "the full knowledge of the presiding judge, the prosecutor, and the defense counsel" and without objection. (*Id.,* at p. 311 [51 L.Ed.2d at p. 358].) Because there was apparently no order authorizing the presence of the public, however, the trial court ordered the reporters not to publish information they obtained at the hearing. In a brief *per curiam* opinion the Supreme Court invalidated the prior restraint, emphasizing that the reporters were present with the court's knowledge and without objection, and stressing that there was "no evidence" that the media "acquired the information unlawfully or even without the State's implicit approval." (*Ibid.*) As it had in *Cox Broadcasting,* the court characterized the information as available to the public and having been placed in the public domain by state officials.

In *Smith* v. *Daily Mail Publishing Co.* (1979) 443 U.S. 97 [61 L.Ed.2d 399, 99 S.Ct. 2667], the court found unconstitutional a West Virginia statute punishing the publication of the names of juvenile offenders. Regardless of whether the statute served as a prior restraint or an after-the-fact punishment of publication, the court held that the publication of the information could not be interfered with. Reviewing its previous decisions in *Cox Broadcasting* and *Oklahoma Publishing,* the court again stressed that the information published was lawfully obtained. "[I]f a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order. . . . A free press cannot be made to rely solely upon the sufferance of government to supply it with information. [Citations.] If the information is lawfully obtained, as it was here, the state may not punish its publication except when necessary to further an interest more substantial than is present here." (*Id.,* at pp. 103-104 [61 L.Ed.2d at p. 405].)

In *The Florida Star* v. *B.J.F.* (1989) 491 U.S. 524 [105 L.Ed.2d 443, 109 S.Ct. 2603], the court struck down a damage award for invasion of privacy for the publication of the name of a rape victim. The victim's name had been

obtained by a reporter from an incident report inadvertently left in the sheriff's department's pressroom and read by a reporter. Relying on what it dubbed the *"Daily Mail* formulation"—the quotation at the end of the preceding paragraph, *ante*—the court again stressed that the information was not unlawfully obtained and was inadvertently released to the public. (*Id.*, at p. 534 [105 L.Ed.2d at pp. 455-456].) The court squarely identified the issue of unlawful acquisition of information by the media, but refused to resolve it: "The *Daily Mail* principle does not settle the issue whether, in cases where information has been acquired *unlawfully* by a newspaper or by a source, government may ever punish not only the unlawful acquisition, but the ensuing publication as well. The issue was raised but not definitively resolved in *New York Times Co.* v. *United States* [cite], and reserved in *Landmark Communications, [Inc.* v. *Virginia]* [cite]. We have no occasion to address it here." (*Id.*, at p. 535, fn. 8 [105 L.Ed.2d at p. 456].)

In the matter before us pictures were obtained in knowing and deliberate violation of law, i.e., rule 980. It would make a mockery of that rule, and of the power and dignity of the court, to allow publication of photographs unlawfully obtained.[3] ▪ We think it clear that news reporters may not violate the law and then hide behind the protective cloak of the First Amendment where "the press [has] no right to information . . . superior to that of the general public." (*Nixon* v. *Warner Communications, Inc., supra,* 435 U.S. at p. 609 [55 L.Ed.2d at p. 587].) It cannot be seriously maintained that a reporter could break into a sealed court file and remove a confidential document, or surreptitiously open a sealed search warrant affidavit including the name of a confidential informant cooperating with police at risk of life and limb, and remove it from the courthouse without permission. Nor could a reporter break into the courthouse and remove a sealed document and then rely on First Amendment absolution. We think the law clearly permits the court to confiscate such stolen items and prevent their removal. As stated by

---

[3]Few cases have considered the issue. In *In re King World Productions, Inc.* (6th Cir. 1990) 898 F.2d 56, on which petitioner relies, the Sixth Circuit struck down a prior restraint on publication of a videotape allegedly illegally obtained. The court's opinion, however, neither makes it clear exactly how the videotape was unlawfully obtained nor discusses the line of Supreme Court authority discussed above. We do not find *King World* persuasive. We do note that a member of the Third Circuit, dissenting in a decision and discussing the issue which was not reached by the majority, opined that the holding of *Cohen* v. *Cowles Media Co., supra,* 501 U.S. __ [115 L.Ed.2d 586, 111 S.Ct. 2513], that a newspaper may be sued for breaking a promise of confidentiality, implies that the current Court would uphold restraint on publication of information obtained illegally. (*Scheetz* v. *The Morning Call, Inc.* (3d Cir. 1991) 946 F.2d 202, 213 (Mansmann, J., dissenting), cert. den. (1992) __ U.S. __ [117 L.Ed.2d 417, 112 S.Ct. 1171].) We also note that in a recent decision of the Florida District Court of Appeal, the court upheld a sentence of criminal contempt against a reporter who published a confidential court document which was meant to be kept under seal. (*Investigation: Florida Statute* v. *State* (Fla.Dist.Ct.App. 1991) 589 So.2d 978, 980-981.) The United States Supreme Court denied certiorari January 11, 1993 (__ U.S. __ [122 L.Ed.2d 172, 113 S.Ct. 1027]).

our high court in *Cohen* v. *Cowles Media Co.*, *supra*, 501 U.S. at p. __ [115 L.Ed.2d at p. 597, 111 S.Ct. at p. 2518]: "[T]he truthful information sought to be published must have been lawfully acquired. The press may not with impunity break and enter an office or dwelling to gather news."
Based on the foregoing, we conclude that photographs or electronic recordings obtained in violation of the law pertaining to the power of the trial court to limit or prevent courtroom media coverage under rule 980, may be subject to restraint.

We recognize the important role of the press under our Constitution in scrutinizing the operation of government and its various branches, departments and agencies. Although it should be obvious, we emphasize that our ruling is narrowly limited to the specific factual matrix within which it arises: the authority of the court to enforce its own lawful rules in such fashion as to secure the purpose of those rules, and especially when they involve the litigants' rights to a fair trial. We certainly do not imply that the courts have any license generally to restrain prior publications or to otherwise interfere with the legitimate function of the press.

### DISPOSITION

The order to show cause is discharged, and the petition for writ of mandate is denied. Respondent municipal court shall continue in possession of the film, per our previous order, and shall destroy the film[4] when this matter is final.

Peterson, P. J., and King, J., concurred.

---

[4]Although the suspect who was unlawfully photographed is not currently charged, California has no statute of limitations for murder.