Michael R. BOYKIN, et al., Plaintiffs,

v.

BLOOMSBURG UNIVERSITY
OF PENNSYLVANIA, et
al., Defendants.

No. 4:CV–94–306.

United States District Court,
M.D. Pennsylvania.

July 7, 1995.

---

Robert S. Mirin, Harrisburg, PA, for plaintiffs.

R. Douglas Sherman, Atty. Gens. Office, Harrisburg, PA, for defendants Dr. Harry Ausprich, Lt. Deborah Barnes, University of Bloomsburg, Charles Confer, Timothy Downs, Dr. Curtis English, Margaret Manning, Dr. Robert Parrish, Sallie Samsel, John Walker and Irvin Wright.

Sarah M. Bricknell, Buchanon Ingersoll, P.C., Harrisburg, PA, for defendant Virginia McAfee.

Sean P. McDonough, Dougherty, Leventhal & Price, Scranton, PA, for defendant William Kreisher.

Samuel E. Klein, Jacquelyn J. Fatula, Dechert, Price & Rhoads, Philadelphia, PA, for defendants Press Enterprise, Inc., and Paul Eyerly, III, Publisher of Press Enterprise.

## OPINION

MUIR, District Judge.

### I. Introduction and Background.

This order relates only to Defendants Bloomsburg University, Dr. Robert Parrish, Dr. Curtis English, Dr. Harry Ausprich, Margaret Manning, Irvin Wright, John Walker, Timothy Downs, Sallie Samsel, and Lt. Deborah Barnes (hereinafter the "Commonwealth Defendants").

On March 2, 1994, Plaintiffs Michael R. Boykin, Margaret L. Boykin, and Aaron M. Boykin filed a complaint in this Court against several Defendants. On May 9, 1994, the Boykins filed a virtually identical complaint based upon the same facts in the Court of Common Pleas of Columbia County, Pennsylvania, which was removed to this Court on May 31, 1994. The two cases were consolidated on June 15, 1994.

On February 1, 1995, the Commonwealth Defendants filed a motion for summary judgment, a brief in support thereof, a statement of material facts, and two volumes of documents in support of their motion.

On February 22, 1995, we issued an order in which we granted the Boykins' motion for a substantial extension of time, until March 24, 1995, to respond to the Commonwealth Defendants' motion for summary judgment as well as other motions for summary judgment filed by other Defendants in this case. The Boykins subsequently obtained an additional 3–week enlargement of time to respond to the Commonwealth Defendants' motion for summary judgment as a result of a then pending motion for disqualification of the undersigned judge filed in this case. Similarly, in order No. 2 of April 19, 1995, we reluctantly allowed the Boykins an additional 15 days to respond to the Commonwealth Defendants' motion for summary judgment. In our order of April 19, 1995, we stated that "[t]he Boykins shall receive no further extensions of time absent exigent circumstances."

In Order No. 3 of May 3, 1995, we allowed the Boykins an additional extension of time within which to respond to the Commonwealth Defendants' motion for summary judgment. Furthermore, on May 10, 1995, we granted the Boykins' "Emergency Motion For Brief Extension Of Time," until May 18, 1995, within which to file a response to the Commonwealth Defendants' motion for summary judgment.

On May 18, 1995, the Boykins finally filed a brief in opposition to the Commonwealth Defendants' motion for summary judgment and a so-called response to the Commonwealth Defendants' statement of material facts. The Boykins also filed individual declarations of Michael Boykin, Margaret Boykin, Howard B. Johnson, and George Mitchell as well as a binder of documents comprised of miscellaneous documents following a declaration of George Mitchell with the caption on it of the case of *Mitchell v. Bloomsburg University, et al., 93–1870 (M.D.Pa.) (McClure, J.)*. On May 25, 1995, the Commonwealth Defendants filed a reply brief.

The individual declarations of Michael Boykin, Margaret Boykin, and George Mitchell were defective because they were not sworn to and were unsigned.

On May 22, 1995, we issued an order in which we deemed withdrawn pursuant to Local Rule 7.5 the Boykins' "Motion To Supplement Record" because they had failed to file a brief in support of their motion.

On May 26, 1995, the Boykins filed a "Motion To Lodge Documents." In this motion, the Boykins requested leave to file corrected declarations as well as additional documents in opposition to the Defendants' motions for summary judgment. Along with the motion, the Boykins filed corrected declarations of Michael Boykin, Margaret Boykin, George Mitchell, and Howard Johnson. In addition to the declarations, the Boykins also filed two volumes of other documents which were not included in their original responses. Volume I is comprised largely of transcripts relating to the criminal proceedings against Michael Boykin from late 1992 and 1993. Volume II contains nothing but 1992 and 1993 newspaper articles and a portion of one transcript from the 1993 trial of Michael Boykin.

In Order No. 1 of May 30, 1995, we required the parties to brief the issue raised in the Boykins' motion to lodge documents. On June 5, 1995, the Boykins filed a brief in support of their motion to lodge documents. On June 7, 1995, the Commonwealth Defendants filed a brief in opposition to the Boykins' motion to lodge documents. On June 12, 1995, we denied the Boykins' emergency motion filed on the date their reply brief was due for an extension of time within to file a reply brief. On June 13, 1995, we issued an order in which we granted the Boykins' motion to lodge documents. Therefore, the Commonwealth Defendants' motion for summary judgment became ripe for disposition on June 13, 1995.

The individual declarations of Michael Boykin, Margaret Boykin, and George Mitchell are based largely on speculation, hearsay, and otherwise inadmissible opinion. The declaration of George Mitchell largely does not even concern the Boykins. Where it does, it expresses Mitchell's opinions and speculation and fails adequately to provide a foundation for a number of his assertions. Moreover, George Mitchell's declaration does not even address the issues raised in this case. The individual declaration of Howard Johnson suffers from similar deficiencies and also bears no relation to the issues raised in this case.

On February 1, 1995, the Commonwealth Defendants filed a statement of material facts in accordance with Local Rule 7.4. The Boykins' response to the Commonwealth Defendants' statement of material facts is hopelessly defective. This Court's orders of April 19, 1995, May 3, 1995, and May 10, 1995, granting the Boykins' last three motions for extensions of time, each provided that the Boykins' response to the Defendants' statements of material facts comply strictly with Local Rule 7.4.

Local Rule 7.4 provides:

The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required

in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried.

All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

■ This Rule furthers the purpose of the summary judgment process in identifying material facts generally in dispute for which a trial is necessary. A non-moving party must adduce more than a mere scintilla of evidence in its favor and cannot simply reassert factually unsupported allegations contained in its pleadings. The failure of the non-moving party to produce such affirmative evidence to create issues in dispute material to the claims presented will result in the grant of judgment in favor of the moving party. *See Hankins v. Temple University,* 829 F.2d 437, 440 (3d Cir.1987).

The Court of Appeals for the Third Circuit has held that the non-moving party is obligated under these rules to identify those facts of record which would contradict the facts identified by the movant. A district court judge is not required to search through the record for facts which might support the Respondents' claim. Allowing the non-moving party to rely on denials of those facts by referring to unidentified evidence provides an unworkable and illogical approach contravening the directive of Rule 56(e) requiring the non-moving party to set forth specific facts showing that there is a genuine issue for trial. *Childers v. Joseph,* 842 F.2d 689 (3d Cir.1988).

Despite these requirements, the Boykins' statement of material facts is largely unresponsive to the Commonwealth Defendants' statement, provides additional irrelevant information, and routinely fails to provide any citation to the record for any of the facts they do allege. Moreover, the Boykins do not provide affirmative evidence to support their contentions. The Boykins' response is filled with unsupported speculation and hearsay. As a result, the Boykins should be deemed to have admitted all of the Commonwealth Defendants' material facts. To adopt any other approach places an undue burden on the Court and defense counsel to examine each page of the Boykins' documentation in order to determine whether the Boykins have created any dispute as to any material facts. This function and duty is one which the Boykins' counsel is obligated to fulfill.

Nevertheless, to the extent practicable, we did attempt to discern the Boykins' response to the Commonwealth Defendants' statements of material facts as well as search the record for facts which might support the Boykins' claims.

## II. Facts Which Are Generally Not in Dispute.

1. Dr. Harry Ausprich was appointed President of Bloomsburg University in the summer of 1985 and remained in that position until August 31, 1993, when he resigned.

2. As President of Bloomsburg University, Ausprich had the final authority for all personnel decisions. His responsibilities included working with the faculty and staff, approving promotions, appointments, reappointments, tenure, discipline, and other personnel matters.

3. Dr. Robert Parrish is and has been the Vice President for Administration at Bloomsburg University since 1982. In that capacity, he reports to the President of the University and oversees the Director of Human Resources, the Director of Physical Plant, the Director of Budget, the Director of University Police and Director of several other Departments within the University community.

4. Parrish is responsible for all general administrative functions of the University, including finance and accounting, budgeting, security, maintenance, and personnel and labor relations.

5. During the Fall of 1991, the University authorized a search for a new Director of University Police to fill a then vacant position.

6. Margaret Boykin applied for the position of Director of University Police following the announcement of a vacancy in that office in September of 1991.

7. Margaret L. Boykin, an individual having experience in police work in Chicago as well as teaching experience, was identified

and sought for the position of Director of University Police.

8. The University offered the position to Margaret Boykin by letter dated February 14, 1992, with a starting date of April 6, 1992. Margaret Boykin declined the offer based upon what she termed "unforeseen personal circumstances." As the supervisor of that position, Parrish did not wish to abandon Margaret Boykin as the University's selection because he thought she was ideally suited for the job. Therefore, he continued to pursue her appointment until such time as it was agreed that she would accept the position but not start working until November 2, 1992. The University was willing to hold the position open for almost seven additional months so that the position could be filled by Margaret Boykin.

9. Following the University's offer of employment, Margaret Boykin declined the appointment by letter dated March 16, 1992.

10. Bloomsburg University continued to seek the employment of Margaret Boykin following her March 16, 1992, rejection of the position.

11. After a conversation between Margaret Manning, Director of Human Resources and Labor Relations at Bloomsburg University, and Margaret Boykin on May 29, 1992, Margaret Manning offered in a letter dated May 29, 1992, the appointment of Margaret Boykin to the position of Director of University Police to commence November 2, 1992, at an annual salary of $45,000.

12. Margaret Boykin, subsequent to the May 29, 1992 letter, accepted the position of Director of University Police at Bloomsburg University.

13. A decision was made by Parrish that because the University was asking Margaret Boykin to relocate her family from Chicago to Bloomsburg, the University would make every attempt to place her husband in a position at the University. Accordingly, it was arranged that Michael R. Boykin would be provided a position as a grounds crew worker at the University without engaging in any competitive process for the position.

14. Margaret Boykin and Michael Boykin are African–Americans.

15. Margaret Boykin assumed the position of Director of Law Enforcement on November 2, 1992.

16. Michael Boykin began his employment as a grounds crew worker on November 3, 1992, and was notified of the terms of the appointment by a letter dated November 9, 1992.

17. Michael Boykin's position was covered by the Collective Bargaining Agreement between the Commonwealth of Pennsylvania and the American Federation of State, County, and Municipal Employees ("AFSCME").

18. Michael Boykin's position as grounds crew worker was subject to an initial six month probationary period under the provisions of the AFSCME Collective Bargaining Agreement and the State System of Higher Education Merit System which began to run on November 3, 1992.

19. During the probationary period, Michael Boykin was exempted from the Collective Bargaining Agreement's just cause provisions for discipline including suspension and termination under Article 29, Section 5 of the Master Agreement.

20. In December of 1992, Lt. Deborah Barnes was working for the University Police Department as a Police Officer and as an investigator. Barnes's supervisor was Margaret Boykin, the wife of Michael Boykin.

21. On December 18, 1992, upon arrival at work at 7:55 p.m., Barnes was given a message to go to the Grounds Crew Trailer immediately.

22. Upon arriving at the trailer, Barnes encountered University Police Sergeant Jack Pollard, Frank Curran, David Fenton and Virginia McAfee. McAfee appeared to be shaking, was rambling, and refused to say what had happened.

23. Barnes asked the males except for Frank Curran to leave the room while she attempted to speak with McAfee. McAfee kept making statements such as blaming herself, stating that he misread her, that they barely knew each other, that people saw them leave together, and make it go away.

At this point, it was obvious to Barnes that something had happened to McAfee.

24. Barnes spoke with Frank Curran who stated he got a phone call at home from McAfee, that she said she was in trouble and needed help, and that it was Mike.

25. Curran also told Barnes that when he arrived, he found McAfee in a state of disarray and that her slip and stockings were torn. He stated he found a dark velvet "skirt" and gave it to McAfee with which to cover herself.

26. McAfee stated that she did not want to go to the hospital and did not want the Women's Center called. McAfee stated she was unclear as to what happened and said that things got a little out of hand and she wanted it to go away. McAfee also stated that she was the victim.

27. When McAfee left the trailer at approximately 10:30—11:00 p.m., Barnes gave McAfee a card with her office and home phone numbers on it in the event she wanted to talk about what had occurred.

28. At approximately 11:00 p.m., Barnes met with University Police Officers at the scene. They decided to call Vice President Parrish to discuss the situation.

29. Barnes normally reported to the Director of Law Enforcement, Margaret Boykin. However, Margaret Boykin had told Barnes in late November of 1992 that Barnes should use her discretion when and if Dr. Parrish, Margaret Boykin's supervisor, should be called in on a matter. Barnes called Dr. Parrish, whom she had answered to on a regular basis while she was Acting Chief of Police, because he was next in line and Barnes immediately perceived a potential conflict if she called Margaret Boykin with a report that her husband was identified as participating in some type of possibly assaultive conduct which required further investigation.

30. On December 18, 1992, Parrish first learned of the event that occurred on campus involving an unauthorized grounds crew Christmas party, Virginia McAfee and Michael Boykin.

31. Parrish came to the University Police Department at 11:40 p.m. at which time the officers told Parrish what they knew about the situation.

32. The following morning at 10:00 a.m., Barnes spoke to Dr. Parrish and expressed to him personal concerns about a possible conflict with the University Police Department handling this matter because Margaret Boykin was the Director of the Department. Barnes spoke about the possibility of the State Police taking over the investigation. Parrish stated that he had not yet spoken to the President, that he wanted to talk to Michael and Margaret Boykin and that they should hold off contacting the State Police until he could do this.

33. At 10:45 a.m., Barnes contacted McAfee by telephone. McAfee seemed depressed and stated she was thinking things over and wanted to do the right thing. McAfee said she did not go to the hospital but did call the Women's Center last night.

34. Barnes then spoke briefly with Parrish who told her that he had spoken to Michael Boykin about the events of the prior night. Thereafter, at about 11:30 a.m., Barnes called McAfee back to determine what she had done with her clothing from the night before. She stated they were on her bedroom floor. Barnes asked her to place them in a brown paper bag and seal it with tape until McAfee determined what she was going to do.

35. Barnes's purpose in requesting McAfee to secure the clothing was to attempt to preserve the evidence for testing and further proceedings in the event McAfee decided to pursue the matter.

36. On December 20, 1992, at approximately 1:00 p.m., Barnes received a message from the University Police Department to call a woman to whom Barnes had been talking. Barnes assumed it was McAfee and called her at her home. McAfee indicated she was ready to talk but needed some questions answered first. Accordingly, Barnes made arrangements to go to McAfee's home.

37. Barnes arrived at McAfee's home and spoke to McAfee who said she had been a mess since Friday, had not been sleeping,

had been getting the shakes, had not changed her clothes, and was just lying on the couch. McAfee stated that she did not want to continue this way and wanted to pursue the matter.

38. McAfee asked Barnes what all her options were and whether Barnes thought anything could be done and whether it would be kept confidential. McAfee had a number of questions and stated that she knew she had to do something because she could not let this happen to someone else. McAfee talked at length about what happened the day and evening of December 18, 1992.

39. In describing the events, McAfee told Barnes that when she got in the truck that night, Michael Boykin said or did something that scared her. McAfee said everything was a blur but that she remembered trying to start the truck, screaming, hearing her clothes rip, getting out of the truck and running to the maintenance building where she called Frank Curran.

40. McAfee said she was afraid that the matter would be swept under the rug because of the position held by Michael Boykin's wife. McAfee also said she was concerned for her safety because she had identified Michael Boykin as the perpetrator. She gave Barnes the brown bag with her clothes in it which Barnes took and placed in a locker where she believed it would be secure.

41. On Monday, December 21, 1992, at 9:45 a.m., Barnes went with Parrish to meet with McAfee who told Parrish the same account of the incident that she had told Barnes the previous day.

42. Later that day, Parrish and Barnes discussed turning the investigation over to the State Police. Parrish then directed Barnes to turn the investigation and evidence previously collected over to the State Police which was done at about 2:30 p.m.

43. After turning the investigation over to the State Police, the direction of the investigation was out of Barnes's hands and she did not have involvement in the investigation of the case nor in the decision to initiate criminal charges against Michael Boykin.

44. At no time did Barnes have any reason to believe McAfee was not truthful when recounting the events of December 18, 1992.

45. Although McAfee was not specific at the onset of the investigation about what had happened, it was clear to Barnes by McAfee's actions that some type of assaultive behavior had occurred. Barnes's training indicated that it is not unusual for a victim of an assault, especially a sexual assault, to try to deny the event or even block it out of her mind. Given the statements by McAfee, her appearance and her actions, it appeared that this could very well have been the case. The sole reason an investigation into the matter occurred was to determine if a crime had occurred.

46. Barnes did not have any involvement in any personnel decision regarding Michael Boykin at the University.

47. Parrish did not, at any time, agree with any other University employees or officials to fabricate any facts concerning Michael Boykin, did not agree to permit such to be done, and does not know of such being done.

48. To the best of Parrish's knowledge, all information he received concerning Virginia McAfee and Michael Boykin was true.

49. Michael Boykin was notified by letter dated December 21, 1992, that he was suspended from his employment as a grounds crew worker effective December 22, 1992.

50. Parrish caused the letter of suspension pending investigation of the December 18, 1992, incident to be delivered to Michael Boykin.

51. Michael Boykin met with Parrish on December 19, 1992, and December 22, 1992, and discussed the incident of December 18, 1992, giving rise to Michael Boykin's suspension.

52. There were allegations made that on December 18, 1992, Michael Boykin had participated in taking a University truck off campus to the State Liquor Store after working hours in order to obtain alcoholic beverages for the Christmas party on University grounds against University policy.

53. The suspension of Michael Boykin from his employment with the University in December of 1992 was unrelated to his race. The suspension was solely due to McAfee's allegations of sexual assault by Michael Boykin, Michael Boykin's arrest on felony charges, and his subsequent indictment. To Parrish's knowledge, the University had never previously encountered a similar situation.

54. Margaret Manning was away from the University at the time of the Christmas party incident on December 18, 1992. The first time Manning heard of Michael Boykin's suspension and the incident was when she returned to work on December 22, 1992.

55. The letter of December 21, 1992, which suspended Michael Boykin from his employment pending investigation was issued by James Michael who was the Acting Director of Human Resources in Manning's absence.

56. Manning agreed that Michael Boykin should be suspended pending the investigation of his conduct on the evening of December 18, 1992.

57. Manning's opinion concerning Boykin's suspension was based upon the allegations of drinking, unauthorized use of a state vehicle, and possible sexual misconduct with Virginia McAfee.

58. At no time was Michael Boykin's race a factor in Manning's opinion that the suspension should remain in effect pending the investigation. Similarly, as far as Manning knew, this was never a factor discussed by anyone involved in the decision to suspend Michael Boykin.

59. Margaret Manning had set up a meeting between Michael Boykin and herself to discuss the incidents of December 18, 1992, his employment situation, and to allow him an opportunity to tell Manning whatever information he thought appropriate in his defense.

60. Michael Boykin contacted Manning and notified her on January 7, 1993, that he would not be able to keep the appointment for January 8, 1993. Manning wrote a letter dated January 7, 1993, to Michael Boykin confirming the matter and asking that he contact her office to schedule an appointment to facilitate the completion of the University's personnel investigation of Michael Boykin's involvement in the December 18, 1992, incident.

61. Michael Boykin did not follow through on Manning's request to schedule a meeting to discuss the incidents of December 18, 1992, and his employment status as requested in the January 7, 1993, letter.

62. Near the end of January, 1993, Manning received a copy of correspondence from State System of Higher Education legal counsel Wayne Melnick to Boykin's attorney, Robert S. Mirin, Esquire, confirming that the University was attempting to arrange a meeting with Michael Boykin to explain the University's evidence against him and to provide an opportunity for Michael Boykin to explain his position before the University made any final decision on discipline in his case. According to the letter, Mr. Mirin stated that because criminal charges had been filed against Michael Boykin, he would not participate in such a meeting and asked that the University discontinue its efforts at arranging such a meeting. After receiving this letter, Manning and the University ceased efforts to meet with Michael Boykin.

63. Michael Boykin's counsel, Mr. Mirin, was in contact with University counsel on a number of occasions regarding Michael Boykin's employment status as well as the criminal charges against him. By letter dated February 2, 1993, Mr. Mirin requested that Michael Boykin's employment status be changed from suspended to Leave Without Pay status pending resolution of the criminal charges against him. As requested by Mr. Mirin, the University subsequently changed Michael Boykin's status to Leave Without Pay.

64. Because of the tone of Mr. Mirin's letters and because he and State System of Higher Education attorney Melnick had established some dialogue concerning the Boykin matter, it was decided that future matters would be handled through the attorneys and neither Manning nor other University personnel would become involved in communicating with attorney Mirin or Michael Boy-

kin regarding his status as an employee at the University.

65. On April 13, 1993, Mr. Mirin was notified that the University had determined to suspend Michael Boykin for three days for his involvement in the December 18, 1992, party and for his involvement in using the University vehicle inappropriately.

66. During the course of the investigation, a large number of people were interviewed between January 29, 1993 and February 3, 1993. On or about March 29, 1993, after the investigation was completed, it was determined that Michael Boykin, Virginia McAfee and Ray Cox would all receive three-day suspensions for their role in taking the State vehicle to the Liquor Store.

67. Fifteen Bloomsburg University personnel received discipline in varying degrees ranging from a reprimand to a two-week suspension based upon their participation and acquiescence in the on-campus party. Of those, 13 were white and 2 were black. Of the three individuals who participated in taking the State vehicle off campus to obtain alcoholic beverages, all three received three-day suspensions.

68. At the time McAfee and Cox received the three-day suspensions on March 29, 1993, Michael Boykin was on suspension for the sexual assault and rape allegations and therefore was unavailable to serve his three-day suspension. Therefore, he was not notified at that time of the University's decision. Rather, that issue was deferred until he returned to work so as not to prejudice any appeal rights which he may have had.

69. During the pendency of the investigation and while the University was trying to sort the matter out, the Pennsylvania State Police filed criminal charges against Michael Boykin on January 11, 1993. Among the charges filed were felony counts of Rape, Criminal Attempt to Commit Rape and Aggravated Indecent Assault.

70. Pursuant to Pennsylvania Regulation 4 Pa.Code § 7.173, a State employee charged with a felony shall be suspended without pay and his or her employment terminated if convicted.

71. Because Boykin remained under criminal indictment, he remained suspended pending disposition of the charges.

72. At some point following the night of December 18, 1992, Dr. Ausprich learned of the allegations regarding Michael Boykin's participation in a possible on-campus rape.

73. Ausprich agreed that Michael Boykin should be suspended pending investigation by the University of any wrongdoing. Once Michael Boykin was charged with criminal felony counts on January 11, 1993, his suspension was, by State regulation, continued pending disposition of the criminal charges.

74. Michael Boykin remained on suspended status without pay during the time period Ausprich remained at Bloomsburg University.

75. Because Ausprich left the University on August 31, 1993, he was not privy to any decision making regarding Michael Boykin's employment status, reinstatement, or back pay after that date.

76. Michael Boykin was tried on the criminal felony charges in October of 1993 in the Court of Common Pleas of Columbia County. On October 28, 1993, the jury acquitted Michael Boykin of all the charges lodged against him.

77. Between the dates of August 19, 1993, and June 30, 1994, Dr. Curtis English served in the appointed position of Interim President of Bloomsburg University.

78. English was not present at Bloomsburg University during the period between December 18, 1992, and January 11, 1993. Hence, English had no involvement with any of the decisions relating to suspension of Michael Boykin.

79. Following English's arrival at Bloomsburg University in mid-August 1993, the first contact he had with regard to the Michael Boykin employment issue was at the end of October 1993 when Michael Boykin was acquitted of the charges filed against him.

80. It was concluded that because Michael Boykin was acquitted of the criminal charges, the University would reinstate him to his prior position as grounds crew worker

and provide him back pay to the date of his initial suspension, December 22, 1992.

81. On Friday, October 29, 1993, the University notified Boykin that he would be reinstated to his position as grounds crew worker effective Monday, November 1, 1993.

82. Although he would have been eligible for reinstatement on November 1, 1993, the effective date of Boykin's reinstatement was delayed until November 4, 1993 to allow for the imposition of the three-day suspension arising from Boykin's inappropriate use of a State vehicle on December 18, 1992 and his participation in the Christmas party involving alcohol on campus.

83. The three-day suspension could not have been implemented earlier because Michael Boykin was suspended pursuant to State regulation pending disposition of the criminal felony charges against him.

84. Issues of back pay and benefits owed to Michael Boykin during the period of suspension from December 22, 1992, through October 29, 1993, had been referred to legal counsel for the State System of Higher Education because of the involvement of Attorney Mirin acting on Michael Boykin's behalf. Conflicts over those amounts owed and determinations of those matters did not involve Parrish or others at the University. Rather, those matters have all been addressed through legal counsel.

85. Sallie Samsel is a black African-American currently employed at Bloomsburg University, Bloomsburg, Pennsylvania, and has been employed by the University continuously since 1987.

86. In December of 1992, Samsel was employed as a Clerk Typist II in the University's Maintenance Department.

87. On December 18, 1992, while working in her office, Michael Boykin approached Sallie Samsel and had an exchange of words with her which she believed were inappropriate and caused her to become upset.

88. Samsel orally reported the matter to her supervisor that afternoon.

89. Subsequently, Samsel filed sexual harassment charges against Michael Boykin.

90. After Michael Boykin's reinstatement in November 1993, an issue had to be addressed regarding the complaint filed by Samsel concerning the conduct of Michael Boykin on December 18, 1992. Pursuant to the University's sexual harassment policy, Samsel had complained of conduct which arguably could comprise sexual harassment by Michael Boykin.

91. As the University is bound to do under the policy, Michael Boykin was notified of the charges, and an investigation was conducted.

92. The investigation and notice to Michael Boykin did not begin sooner because Michael Boykin was suspended under State regulation and was not available as an employee to respond to the charges.

93. Vice President Parrish conducted a fact finding hearing on the Samsel charges on December 23, 1993. Following the hearing, Parrish made a recommendation to English in which Parrish found that there was evidence to support that Michael Boykin's contact with Sallie Samsel caused her great discomfort and that Michael Boykin's job duties did not require him to be in Samsel's work area. Nevertheless, Parrish did not believe that a single incident as described by Samsel was sufficient to constitute sexual harassment.

94. Following receipt of Vice President Parrish's report, English reviewed it and listened to the tape recording of the fact finding hearing. English also reviewed the documentation submitted as evidence during the proceedings.

95. After reviewing the materials from the hearing, English determined that no formal discipline would be taken against Michael Boykin. However, he did order Michael Boykin to refrain from entering Samsel's office except for business purposes.

96. No other action was taken against Michael Boykin with respect to Samsel's complaint.

97. English's direction to Michael Boykin was based on the fact that he had no legitimate business purpose for being present in Samsel's office and that his actions did cause her some degree of discomfort or anxiety.

98. English did not have any other occasion to take any action with respect to the employment of Michael Boykin. English never took any action against either Margaret Boykin or her son, Aaron Boykin.

99. Samsel did not, at any time, agree with any University employees or officials to fabricate facts concerning Michael Boykin, nor did she agree to permit such to be done, and does not know of such being done.

100. Timothy Downs has been employed by Bloomsburg University continuously since August, 1984. He is currently employed by the University as the Plumbing Supervisor.

101. In December of 1992, Downs was employed as the Plumbing Supervisor at the University.

102. On December 18, 1992, Downs was at work and attended the maintenance department Christmas party held at the Grounds trailer.

103. While at the party Downs had occasion to speak with Michael Boykin.

104. Later that afternoon, Downs went to the Maintenance Office and found Michael Boykin seated close to Samsel.

105. Downs could tell by the look on Samsel's face that she was disturbed by Michael Boykin's presence. Samsel quickly got up and suggested to Downs that she get some papers for Downs in another office.

106. When they arrived at the other office, Samsel stated to Downs that Boykin was pressuring her about going to the party and that she found his persistent behavior inappropriate and offensive.

107. Following Samsel's filing of sexual harassment charges against Boykin, Downs testified concerning his conversations and observations at the fact finding hearing.

108. The testimony Downs gave at that hearing to the best of his recollection was true and correct.

109. Downs did not, at any time, agree with any other University employees or officials to fabricate any facts concerning Michael Boykin, did not agree to permit such to be done, and does not know of such being done.

110. To the best of Downs's knowledge, all information he received concerning Samsel and Michael Boykin was true and he had no reason to dispute its accuracy.

111. At no time was Downs a part of any conspiracy with University officials, employees or anyone regarding racial discrimination concerning the Boykins or anyone else.

112. On April 23, 1993, the University received a subpoena from attorney Mirin seeking the production of an extensive list of documents purportedly to be relevant to the criminal charges against Michael Boykin.

113. The matter of responding to the subpoena was turned over to legal counsel Melnick for appropriate handling. Neither Manning, nor anyone else at the University determined what documents to produce or what not to produce. The decision of turning over documents was of a legal nature made by legal counsel and not the University.

114. John Walker was the Vice President for University Advancement from 1984 until his retirement on June 30, 1993.

115. As the Vice President for University Advancement, Walker oversaw the Development Office, Alumni Office, University Relations Office, Affirmative Action Office, Office of Research and Planning and governmental relations and community affairs.

116. Walker was on sabbatical leave from the University during the Fall 1992 semester and did not return to perform any duties at the University until January 11, 1993.

117. One of the functions of the University Relations Office was to act as a liaison between the University and the community, whether it be the town of Bloomsburg or a larger segment of the population which may have contact with the University.

118. The University Relations Office also had duties answering press inquiries and making press statements on matters of University and community concern.

119. During the 1992 year, three Bloomsburg University students had been raped.

120. These crimes in a relatively rural and calm community evoked concern and

fear among both the student population and the surrounding community.

121. In order to combat rumor and fear, the University, through the University Relations Office, established the BeSafe Hotline which was a telephone number which individuals could call to obtain a pre-recorded message with current information about serious incidents and safety issues affecting the campus community.

122. The BeSafe Hotline was in operation as early as March 1992, long before the Boykins moved to Bloomsburg.

123. The Hotline messages concerned a variety of topics and did not solely involve the case of Michael Boykin. Rather, all events occurring within the Bloomsburg Community and which concerned serious issues of public safety were conveyed on the Hotline.

124. Typically, the message was changed daily or every two to three days depending on what news there was to be reported. The longest any message ran on the Hotline was approximately one week. Generally, if there was no new information to report, the University would place a general BeSafe message on the recording.

125. Michael Boykin was never referred to as the "Bloomsburg serial rapist" in any Hotline message.

126. The Hotline messages simply contained information in the public domain in an attempt to maintain an open dialogue with the Bloomsburg community because of the seriousness of a variety of events which had occurred during the relevant time period.

127. To the best of Walker's knowledge the hotline messages concerning Michael Boykin were all based upon public record.

128. The University, during the Fall of 1992 and early 1993 was deluged with requests by students and their parents for information regarding the series of rapes and other campus crimes. Typically, the tone of the request sought information regarding student security and what was being done in that regard.

129. In response to the requests for information, the University Relations Office issued a series of letters to University students and their parents, alumni, trustees, and other government officials concerning the events occurring at Bloomsburg University in order to keep them informed and alleviate fears and concerns over those events.

130. Because of the media attention given to the events occurring at Bloomsburg University including the rapes and other serious incidents, it was felt that it was incumbent upon the University to place facts of public record before those persons interested in order to dispel any false notions as to what was happening and to quell inaccurate rumors.

131. The letter of January 12, 1993, is the only such letter sent from the University which concerned the criminal charges against Michael Boykin although the letter did not mention him by name.

132. To the best of Walker's knowledge at the time the letter was issued and up to today, the letter was accurate and Walker has no reason to believe otherwise.

133. Walker did not have any involvement in any personnel decisions regarding Michael Boykin including the decisions to suspend his employment, discipline him, or the issues involving his reinstatement. Those issues were outside his area of responsibility at the University.

134. Parrish had no part in the creation of the University BeSafe Hotline messages although to the best of his knowledge, everything that was on the message was true.

135. At no time did Parrish, individually or on behalf of the University, indicate orally or in writing that Michael Boykin was the Bloomsburg serial rapist.

136. At no time did Ausprich ever say to anyone that Michael Boykin was responsible for the serial rapes which occurred at Bloomsburg nor did he ever represent such in any communications sent from the University.

137. Michael Boykin filed a charge of discrimination with the Pennsylvania Human Relations Commission at Docket No. E-65226D.

138. At the request of Michael Boykin, the Pennsylvania Human Relations Commission withdrew the complaint docketed at No. E–65226D and sent notice of that action to Michael Boykin by letter dated June 6, 1994.

139. Michael Boykin filed a charge of discrimination before the Equal Employment Opportunity Commission at No. 17F933161.

140. The Equal Employment Opportunity Commission issued a right to sue letter to Michael Boykin under Charge No. 17F933161 on April 8, 1994.

141. Irvin Wright is employed by Bloomsburg University as an Assistant Professor and the Assistant Director of ACT 101/EOP within the Department of Developmental Instruction at Bloomsburg University.

142. Wright is an African–American.

143. Wright founded the Bloomsburg University Black Caucus in 1991 and has served as Chairperson of that organization.

144. Wright routinely attends meetings and conferences of the Pennsylvania Black Conference of Higher Education and has done so for a number of years as a representative of Bloomsburg University.

145. One of the functions served at the conferences of the Pennsylvania Black Conference of Higher Education is discussion of matters occurring on and relating to other college and University campuses in order to share experiences and learn from others relating to matters affecting the minority populations in the institutions of higher learning. This is done in formal settings as well as during informal discussions at times established through the conferences.

146. The expenses of the trip for attendance at the conferences are paid by the University.

147. In February of 1993 Wright attended a conference in Pittsburgh, Pennsylvania. Wright was in Pittsburgh from February 24 until February 27, 1993, for that conference.

148. Wright had no involvement in any personnel decisions concerning Michael Boykin's suspensions, reinstatement or any other aspect of his employment at Bloomsburg University.

149. Wright has no knowledge of anyone at the University taking any actions against Michael Boykin, his wife or son on account of their race.

150. Wright never participated in any discussions or agreements with any other individuals in which it was suggested that any action be taken against Michael Boykin because of his race or to deprive him of any right, nor does he know of anyone else doing so.

151. Margaret Boykin has held the position of Director of University Police at Bloomsburg University continuously from November 2, 1992 through the present.

152. Margaret Boykin has not been the subject of any University discipline including reprimand, suspension, or termination during her employment at Bloomsburg University.

153. Margaret Boykin has not filed any charges of discriminatory conduct against Bloomsburg University or its officials or employees with the Pennsylvania Human Relations Commission or the Equal Employment Opportunity Commission.

154. Margaret Boykin was not charged with any criminal conduct arising from the December 18, 1992, occurrences at Bloomsburg University.

155. Bloomsburg University has not withheld any compensation due Margaret Boykin under the terms of her employment as Director of University Police at Bloomsburg University.

156. Aaron M. Boykin is the minor son of Margaret and Michael Boykin.

157. Aaron Boykin is not an employee of Bloomsburg University.

158. Aaron Boykin is not a student at Bloomsburg University.

159. Aaron Boykin has not filed any charges of discriminatory conduct against Bloomsburg University or its officials or employees with the Pennsylvania Human Relations Commission or the Equal Employment Opportunity Commission.

160. Aaron Boykin was not charged with any criminal conduct arising from the De-

cember 18, 1992, occurrences at Bloomsburg University.

161. Bloomsburg University has not withheld any compensation due Aaron Boykin under the terms of any contract with Bloomsburg University.

### III. Discussion.

 Summary judgment is appropriate only when there is no genuine issue of material fact which is unresolved and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). Summary judgment is an extreme remedy and should not be granted when there is a disagreement about the facts or the proper inferences which a factfinder could draw from them. *Peterson v. Lehigh Valley Dist. Council,* 676 F.2d 81, 84 (3d Cir.1982). "When a motion for summary judgment is made and supported as provided in ... [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading...." Fed.R.Civ.P. 56(e). The adverse party must show by affidavits, pleadings, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue for trial. *Id.* Because summary judgment is a severe remedy, the Court should resolve any doubt about the existence of genuine issues of fact against the moving party. *Ness v. Marshall,* 660 F.2d 517, 519 (3d Cir.1981).

 The United States Supreme Court has stated that in motions for summary judgment a material fact is one which might affect the outcome of the suit under relevant substantive law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Supreme Court also stated in *Anderson* that a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248, 106 S.Ct. at 2510. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Company, Ltd. v. Zenith Radio Corporation,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

 Initially, the moving party has a burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corporation v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). This may be met by the moving party pointing out to the court that there is an absence of evidence to support an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325, 106 S.Ct. at 2553–54. The non-moving party then must make a sufficient showing as to the essential elements of his or her case that a reasonable jury could find in his or her favor. *Id.* at 322–23, 106 S.Ct. at 2552–53.

In light of these principles, we will now address the Commonwealth Defendants' motion for summary judgment.

In their motion for summary judgment, the Commonwealth Defendants allege that there is no genuine issue as to any material fact and they are entitled to summary judgment as a matter of law on Counts I through X of the Boykins' complaint.

On November 23, 1992, Michael Boykin was hired as a grounds crew employee for Bloomsburg University of Pennsylvania. He was suspended from that position on December 22, 1992, following events stemming from a December 18, 1992, Christmas party. A co-worker who attended the Christmas party with Michael Boykin accused him of raping her in a university truck in a parking lot near the party. Michael Boykin was subsequently arrested on January 11, 1993, and charged with rape, aggravated indecent assault, simple assault, and criminal intent to commit rape.

Prior to Michael Boykin's arrest, a number of rapes had occurred in Bloomsburg. Michael Boykin alleges that agents for Bloomsburg University, agents for Bloomsburg City Police, William Kreisher, Esq., District Attorney of Columbia County, Pennsylvania, and a number of Pennsylvania State Police Troopers negligently, recklessly, and falsely convened a press conference identifying Michael Boykin as the "serial rapist" of Bloomsburg. Michael Boykin was acquitted of all charges stemming from the December 18, 1992, Christmas party and the alleged rape.

The Boykins' claims arise from the arrest and trial of Michael Boykin on the rape charges, his suspension from employment with Bloomsburg University and the surrounding publicity.

■ We will first address Counts I–III, V and X of the Boykins' complaint as they apply to Bloomsburg University only.

The Eleventh Amendment to the United States Constitution has consistently been interpreted to preclude suits against a state in federal court by citizens of that state or other states. *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 238, 105 S.Ct. 3142, 3145, 87 L.Ed.2d 171 (1985); *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 98, 104 S.Ct. 900, 906–07, 79 L.Ed.2d 67 (1984).

While a state may consent to suit in federal court, thereby waiving its immunity, the Commonwealth of Pennsylvania has not done so. *Laskaris v. Thornburgh*, 661 F.2d 23, 25 (3d Cir.1981). As a result, a suit against the Commonwealth of Pennsylvania or one of its agencies, such as Bloomsburg University, is proscribed by the Eleventh Amendment. *Laskaris*, 661 F.2d at 25. *See also Pennhurst*, 465 U.S. at 98, 104 S.Ct. at 906–07.

Congress may abrogate the states' immunity. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976). However, in § 1983 actions the states' immunity has not been abrogated. *Quern v. Jordan*, 440 U.S. 332, 342, 99 S.Ct. 1139, 1145–46, 59 L.Ed.2d 358 (1979). Similarly, the states' immunity has not been abrogated for actions brought under §§ 1981, 1985, and 1986. *See Rode v. Dellarciprete*, 617 F.Supp. 721, 723 (M.D.Pa.1985) (Caldwell, J.), *aff'd*, 845 F.2d 1195 (3d Cir.1988).

Pennsylvania has waived immunity for claims brought under the Pennsylvania Human Relations Act in state court. However, Pennsylvania has not waived its immunity for such claims brought in federal court. *See Laskaris*, 661 F.2d at 25. As such, we have no jurisdiction over this state law claim against the Bloomsburg University.

We are of the view that the claims against Bloomsburg University in Counts I–III, V and X of the Boykins' complaint cannot be maintained in this Court. We will grant judgment on these claims in favor of Bloomsburg University and against the Boykins.

■ We will now address Count I of the Boykins' complaint as it relates to the other Commonwealth Defendants. Count I of the Boykins' complaint alleges that they were deprived of their right of full and equal benefit of all laws and proceedings for the security of persons and property in violation of 42 U.S.C. § 1981(a) through (c).

■ 42 U.S.C. § 1981 forbids intentional discrimination based upon race in the making and enforcement of contracts. *Rogers v. Mount Union Borough by Zook*, 816 F.Supp. 308, 312 (M.D.Pa.1993) (Caldwell, J.). The term "make and enforce contracts" primarily includes the making, performance, modification, and termination of contracts. *Id.* However, § 1981 can encompass other broader conduct based upon racial discrimination. *Grier By Grier v. Galinac*, 740 F.Supp. 338, 342 (M.D.Pa.1990) (Caldwell, J.).

■ Liability under § 1981 is personal in nature, much like that under § 1983, and cannot be imposed vicariously. Because liability is premised upon intentional discrimination, personal involvement of a defendant is essential. *See Jett v. Dallas Independent School District*, 491 U.S. 701, 735, 109 S.Ct. 2702, 2722–23, 105 L.Ed.2d 598 (1989); *See also, General Building Contractors Association, Inc. v. Pennsylvania*, 458 U.S. 375, 392–397, 102 S.Ct. 3141, 3150–54, 73 L.Ed.2d 835 (1982). Conclusory allegations of generalized racial bias do not establish discriminatory intent. *Flagg v. Control Data*, 806 F.Supp. 1218, 1223 (E.D.Pa.1992) (Katz, J.).

The Boykins have presented nothing more than conclusory allegations that the race of Michael Boykin played a part in any of the Commonwealth Defendants' conduct. There is simply no evidence that the race of Michael Boykin was a factor in the conduct of any of the Commonwealth Defendants. We are of the view that all Commonwealth Defendants are entitled to summary judgment on Count I of the Boykins' complaint.

We will now address Count II of the Boykins' complaint as it relates to the other Commonwealth Defendants. Count II contends that the Defendants' conduct constituted ongoing state action, a conspiracy, and a repeated course of state action under statute, ordinance, regulation, custom, or usage of the Commonwealth of Pennsylvania. This conduct allegedly caused the Boykins to suffer loss of rights established under the Constitution, including the rights to due process and equal protection in violation of 42 U.S.C. § 1983.

The Boykins do not specify which particular conduct of any particular Defendant form the basis of this Count. Rather, the Boykins simply claim that the conduct set forth in paragraphs 1 through 75 of their complaint constitutes a violation of § 1983. Given the Boykins' pleading deficiencies, we have attempted to identify the violations arguably stated against each of the Commonwealth Defendants.

■ Section 1983 provides a remedy for deprivations of federally protected rights caused by persons acting under color of state law. The two essential elements of a § 1983 action are: (1) the conduct complained of was committed by a person acting under color of state law; and (2) this conduct deprived a person of a federally protected right. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981).

■ The Boykins allege a violation of due process arising from Michael Boykin's suspension from employment on December 22, 1992, continuing until his reinstatement in November, 1993. The Boykins allege, among other things, that Michael Boykin was not provided a hearing and was not told the reasons for his suspension.

■ The Due Process Clause is not implicated every time an individual suffers a loss because of some government action. *Brandon v. District of Columbia Board of Parole*, 631 F.Supp. 435, 438 (D.D.C.1986) (Richey, J.). Without a protected interest, even a "grievous loss" will not trigger due process protection. *Meachum v. Fano*, 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976).

"To have a property interest in a benefit, a person clearly must have more than an abstract need or a desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The Supreme Court in *Roth* went on to state:

> [p]roperty interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* The same is true whether the interest claimed is characterized as a property interest or a liberty interest. *See Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983).

■ However, because he was an at-will employee, Michael Boykin had no protected interest in his employment. In order to make this determination, we must look to Pennsylvania state law. *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); *Cooley v. Pennsylvania Housing Finance Agency*, 830 F.2d 469, 471 (3d Cir. 1987). Under Pennsylvania law, public employees have at-will status and are subject to summary removal by the employing agency. *Cooley*, 830 F.2d at 471. Thus, Michael Boykin has no property or liberty interest relating to the discipline imposed upon him unless he can point to a state statute, regulation, or agreement between the employer and employee establishing such a secured right. *Albrechta v. Borough of White Haven*, 810 F.Supp. 139, 142 (M.D.Pa.1992) (Kosik, J.).

Michael Boykin was a probationary employee under the terms of a collective bargaining contract. By the terms of that agreement, a probationary employee does not receive the right not to be disciplined except upon just cause and does not receive the right to be heard with respect to the discipline imposed upon him. As a result, Bloomsburg University was free to suspend Michael Boykin, terminate him, or take other

disciplinary action without providing him notice and an opportunity to be heard as would be required with a permanent tenured employee. *See Blanding v. Pennsylvania State Police,* 811 F.Supp. 1084 (E.D.Pa.1992) (Reed, J.); *Sweeting v. Commonwealth, Pennsylvania State Police,* 95 Pa.Cmwlth. 45, 503 A.2d 1126 (1986); *Marino v. Commonwealth, Pennsylvania State Police,* 87 Pa.Cmwlth. 40, 486 A.2d 1033 (1985). Because Michael Boykin had no interest protected by the Due Process Clause he was not denied procedural due process. Furthermore, Michael Boykin suffered no loss of property because he was paid by the University after his acquittal for his wages during the period of suspension.

We will now address the Boykins' § 1983 claim under Count II against Defendants Downs and Samsel. In their brief in opposition to the Commonwealth Defendants' motion for summary judgment, the Boykins state that they have decided to discontinue their claims against Downs. We agree that the Boykins cannot maintain any cause of action against Downs and we will grant summary judgment in Downs's favor for the reasons stated below.

■ The Boykins' claims against Bloomsburg University employees Downs and Samsel relate to an administrative internal complaint Samsel lodged with the University against Michael Boykin for allegedly harassing conduct that occurred during the afternoon of December 18, 1992. On December 23, 1993, after Michael Boykin returned to work at the University, a fact finding hearing was held by Dr. Parrish to resolve the complaint. Downs was called as a witness to testify about his observation of the incident. As a result of the proceeding, Michael Boykin was instructed to refrain from having contact with Samsel except for purposes of official business. No disciplinary action was taken against Michael Boykin.

■ The Boykins have failed to present a viable § 1983 claim against either Samsel or Downs. Not every action taken by a state employee is deemed to have occurred under color of state law. Action is "under color of state law" only when the alleged wrongdoer is acting by virtue of his state authority.

*Hughes v. Meyer,* 880 F.2d 967, 971 (7th Cir.1989).

■ The Court of Appeals for the Third Circuit has held that liability cannot be imposed for damage caused by a private citizen or a public official exercising the right to report to an appropriate agency what he or she believed to be improper conduct inducing legislative, administrative, or judicial action. *Brownsville Golden Age Nursing Home, Inc. v. Wells,* 839 F.2d 155, 159–160 (3d Cir.1988).

The furnishing of information by Downs and Samsel to the proper authorities concerning Michael Boykin's alleged wrong-doing were the acts of private individuals and not those of state actors. *See Hughes,* 880 F.2d at 972. Moreover, no protected interest of Michael Boykin was infringed upon by Samsel's complaint and the administrative proceeding. No adverse action was taken against Michael Boykin.

■ To the extent the Boykins contend that Samsel and Downs provided false information during the proceedings and injured Michael Boykin's reputation, Michael Boykin had no liberty or property interest in his reputation implicated in this factual scenario. Defamation is not actionable under a § 1983 claim in this context. *Paul v. Davis,* 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976). We will grant summary judgment in their favor on Count II.

■ We will now address the Boykins' § 1983 claim in Count II against Defendant Walker. The Boykins' only claim against Walker is based upon the publication of the BeSafe hotline messages which referred to the arrest and criminal charges against Michael Boykin and the University letter to University students and their families on January 12, 1993, relating to a number of safety issues including the status of the charges pending against Michael Boykin. The only information published was information from public records and therefore no constitutional right or violation thereof is implicated. Moreover, because this claim sounds in defamation, it is not cognizable in a § 1983 action. *Paul,* 424 U.S. at 713, 96 S.Ct. at 1166. *See also Scheetz v. The Morn-*

*ing Call, Inc.,* 946 F.2d 202 (3d Cir.1991), *cert. denied,* 502 U.S. 1095, 112 S.Ct. 1171, 117 L.Ed.2d 417 (1992). We will grant summary judgment on Count II as to Walker.

■ We will now address the Boykins' § 1983 claim on Count II against Barnes and Parrish. This is the only count in the Boykins' complaint alleging a constitutional violation that appears to apply to Barnes and Parrish.

The Boykins allege that Barnes exerted some improper influence upon the victim, Virginia McAfee, causing her to create false charges against Michael Boykin. Although not as explicit, the same sort of allegations appear to be asserted against Parrish. It is unclear whether the Boykins are pursuing a theory of a due process violation under a false arrest-false imprisonment theory or under a malicious prosecution theory.

Count II of the Boykins' complaint does not specify the basis for a constitutional right to assert these claims and is therefore insufficient as a matter of law. The Boykins must assert a specific federal constitutional or statutory right in order to maintain a claim under the civil rights laws. *Brown v. Borough of Mahaffey, Pennsylvania,* 35 F.3d 846, 850 (3d Cir.1994), citing *Albright v. Oliver,* ___ U.S. ___, ___, 114 S.Ct. at 807, 811, 127 L.Ed.2d 114 (1984).

Because the Boykins do not specify the specific constitutional right relied upon in Count II of their complaint but only generally refer to open-ended conceptions of due process and equal protection, their claims are insufficient as a matter of law. *See also Perez-Ruiz v. Crespo-Guillen,* 25 F.3d 40, 42 (1st Cir.1994).

■ Even if the Boykins had set forth an adequate § 1938 claim based upon either a false arrest-false imprisonment, malicious prosecution, or abuse of process theory, their claim would still fail. The cornerstone of a false arrest-false imprisonment claim is that the process used for the arrest was void on its face. *Lynch v. Johnston,* 76 Pa.Cmwlth. 8, 13, 463 A.2d 87, 89 (1983). It is not enough that the charges were unjustified. *Id.* The Boykins must show that the arrest was made without probable cause and for an improper purpose. *See Mendoza v. K–Mart, Inc.,* 587 F.2d 1052, 1059 (10th Cir.1978). Similarly, in a malicious prosecution or abuse of process case the basic notion is that a defendant initiated proceedings for an improper or malicious purpose unrelated to securing the just administration of our laws. *Bell v. Brennan,* 570 F.Supp. 1116, 1118 (E.D.Pa.1983) (Giles, J.).

However, neither Barnes nor Parrish were responsible for the arrest of Michael Boykin. The Boykins have presented no evidence that either Barnes or Parrish took any action for an improper purpose. The Boykins have presented nothing more than speculation on this issue.

Even if we were to construe the Boykins' constitutional claim as alleging a substantive due process violation, the evidence in this case does not demonstrate any conduct rising to the level of "shocking the conscience" sufficient to establish such a claim. *See Fagan v. City of Vineland,* 22 F.3d 1296, 1303 (3d Cir.1994).

Also, the individual Commonwealth Defendants are entitled to qualified immunity. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

We are of the view that the actions taken by the Commonwealth Defendants did not violate any clearly established rights of the Boykins. We will grant summary judgment on Count II as to each of the Commonwealth Defendants.

■ We will now address Count III of the Boykins' complaint as to the Commonwealth Defendants other than Bloomsburg University. Count III alleges a violation of 42 U.S.C. § 1985 by the Defendants' participation in a conspiracy that hindered the due course of justice and was calculated to deny Michael Boykin equal protection because of his race. Count III also alleges that the Defendants knew of the aforementioned vio-

lations and neglected to prevent them, in violation of 42 U.S.C. § 1986.

■■■ 42 U.S.C. § 1985 prohibits public and private conspiracies which deprive persons of constitutionally protected rights. *Rogers v. Mount Union Borough by Zook,* 816 F.Supp. 308, 314 (M.D.Pa.1993) (Caldwell, J.).

Section 1986 allows a cause of action against the party who had knowledge of a § 1985 conspiracy, had the power to prevent it, and then failed to do so. Therefore, transgressions of § 1986 by definition depend upon a preexisting violation of § 1985. *Rogin v. Bensalem Township,* 616 F.2d 680, 696 (3d Cir.1980), *cert. denied,* 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981). Mere conclusory allegations that a conspiracy existed will not survive a motion to dismiss. *Id.*

The Boykins have presented no evidence to support their claim that a conspiracy existed to deprive them of their civil rights. Rather, only suspicions, speculation, and feelings support their claim of conspiracy. This simply is not sufficient. We will grant summary judgment on Count III of the Boykins' complaint as to each of the Commonwealth Defendants.

■■■ We will now address Counts IV and V of the Boykins' complaint. Count IV contends that the Defendants unlawfully discriminated against Michael Boykin because of his race and sex, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. Count V alleges a violation of the Pennsylvania Human Relations Act, 43 Pa.S.A. § 951 et seq., on the basis of race and sex.

Michael Boykin filed a complaint with the Pennsylvania Human Relations Commission on June 16, 1993, under No. E–65226D. This complaint was crossfiled with the Equal Employment Opportunity Commission at No. 17F–933161. Michael Boykin then filed an amended complaint on July 19, 1993, which superseded his first one. Michael Boykin later withdrew the Pennsylvania Human Relations Commission charge and allowed the Equal Employment Opportunity Commission charge to continue. Michael Boykin subse-

quently received a right to sue letter from the Equal Employment Opportunity Commission on charge No. 17F–933161.

The charge contained within the amended complaint before the EEOC alleges that Michael Boykin was discriminated against based on his race when he was suspended and subjected to unequal conditions of employment on December 22, 1992.

The charge filed with the Equal Employment Opportunity Commission did not involve any claims against Wright, Downs, Samsel, or English. It arguably involved claims against Parrish, Manning, and Ausprich relating to Michael Boykin's suspension, a claim against Walker concerning the publicity, and a charge against Barnes relating to her initial investigation of the sexual misconduct.

■■■ Title VII prohibits an employer from discriminating against an individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. *See* 42 U.S.C. § 2000e–2. As set forth in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981):

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. [citations omitted].

*Id.* at 252–253, 101 S.Ct. at 1093. Proof of discriminatory motive is critical. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). The Boykins bear the burden of establishing that the Commonwealth Defendants' actions were motivated by race. *St. Mary's Honor Center v.*

*Hicks,* —— U.S. ——, ———, 113 S.Ct. 2742, 2747–9, 125 L.Ed.2d 407 (1993). Title VII does not protect employees from unfair employment actions but only from employment actions motivated by the person's race or other protected status. *See Dodge v. Susquehanna University,* 796 F.Supp. 829, 836 (M.D.Pa.1992) (McClure, J.).

Title VII only applies to the actions of an employer. Lt. Barnes was not Michael Boykin's employer. Rather, she was a police officer conducting a criminal investigation who happened to be employed by Bloomsburg University. It is inconceivable within the framework of Title VII that a claim of this sort can be brought based upon Barnes's investigation.

The Boykins have presented no evidence that any action was taken with respect to the criminal investigation, the suspension, or the publicity surrounding the arrest of Michael Boykin which would implicate racial discrimination. Rather, the Boykins only set forth speculative allegations and no facts upon which racial discrimination by any of the Commonwealth Defendants can be based. The facts in this case clearly establish legitimate reasons for each of the actions taken with respect to the Boykins. We will grant the Commonwealth Defendants' motion for summary judgment on this Count as well.

We will now address the Boykins' claim under the Pennsylvania Human Relations Act. This claim is totally without merit. Michael Boykin did not receive a right to sue letter from the Pennsylvania Human Relations Commission as contemplated by the Pennsylvania Human Relations Act. Rather, Michael Boykin withdrew his charge under the Pennsylvania Human Relations Act and therefore abandoned any right to pursue that claim. We will grant summary judgment on this claim as well.

We will now address Count X of the Boykins' complaint. This Count alleges violations of the Boykins' first, fourth, fifth, and fourteenth amendment rights under the United States Constitution. Count X is directed towards the individual State Police Defendants who were previously dismissed from this case. Count X was added to the complaint when the Boykins filed a second complaint which named the individual state police officers previously identified as John Doe State Police Officers in their original complaint.

As previously discussed in this order, the actions of the Commonwealth Defendants did not violate any constitutional right of the Boykins. We are of the view that the facts in this case fail to establish any cause of action against the Commonwealth Defendants under the United States Constitution. We will grant the Commonwealth Defendants' motion for summary judgment on Count X as well.

■ Only persons actually deprived of their civil rights can redress such rights in a civil rights action. *See O'Malley v. Brierley,* 477 F.2d 785, 789 (3d Cir.1973). The Boykins have presented no evidence that any of the Commonwealth Defendants took any action against either Margaret Boykin or Aaron Boykin, a very young child. Thus, there is no basis for a cause of action by either Margaret Boykin or Aaron Boykin.

We will now address the Boykins' claims under state tort law. Counts VI through IX allege state tort actions brought pursuant to this Court's pendent jurisdiction. The Boykins allege claims of false imprisonment, defamation, invasion of privacy, and malicious prosecution. Counts I–IV and Count X of the Boykins' complaint are the only bases for federal subject matter jurisdiction. Because we will grant the Commonwealth Defendants' motion for summary judgment as to the federal claims asserted in the Boykins' complaint, we will remand the pendent state claims to the Court of Common Pleas of Columbia County. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

We will defer the entry of judgment by the Clerk so as not to prejudice any person or persons who may wish to file an ancillary motion or motions prior to entry of judgment.

An appropriate order will be entered.

### ORDER

1. The Commonwealth Defendants' motion for summary judgment filed on Febru-

ary 1, 1995, is granted with respect to Counts I through V and Count X.

2. The Clerk of Court shall enter judgment two weeks from today on behalf of Defendants Bloomsburg University, Dr. Robert Parrish, Dr. Curtis English, Dr. Harry Ausprich, Margaret Manning, Irvin Wright, John Walker, Timothy Downs, Sallie Samsel and Lt. Deborah Barnes and against the Plaintiffs Michael R. Boykin, Margaret L. Boykin, and Aaron M. Boykin.

3. This case is remanded to the Court of Common Pleas of Columbia County, Pennsylvania.